### In re MIAMI GENERAL HOSPITAL, INC., Debtor.

### No. 87–1562–Civ.

United States District Court,
S.D. Florida,
Miami Division.

Jan. 14, 1988.

Stroock & Stroock & Lavan, Miami, Fla., for trustee.

Andrew H. Moriber, Dubbin, Eerkman, Garber, Bloom & Moriber, Miami, Fla., for Unsecured Creditors Committee.

Asher Rabinowitz, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Marvin S. Rosen, Honigman, Miller, Schwartz & Cohn, West Palm Beach, Fla., for First American Bank and Trust.

Dennis Alan Richard, Richard and Richard, Miami, Fla., for Dr. Roberto Moya.

Leonard H. Gilbert, Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, Tampa, Fla., for First Bank.

Irving M. Wolff, Harry D. Lewis, Holland & Knight, Miami, Fla., for General Health, L.P. Limited.

## MEMORANDUM DECISION

SCOTT, District Judge.

This is an appeal by General Health, L.P. Limited ("General Health"), an unsuccessful bidder in the purchase of Miami General Hospital, the debtor in bankruptcy. General Health appeals from the Order Confirming Sale To First American Bank and Trust and the Order Overruling Objections To Sale. General Health seeks to vacate the sale held on July 8, 1987 and order a new bankruptcy sale of the hospital. The First American Bank and Trust ("FABT"), the successful bidder for Miami General Hospital and a creditor-mortgagee of Miami General, urges affirmance.

## I. HISTORY OF THE CASE

International Medical Centers, Inc. ("IMC") is a health-maintenance organization which owns the stock of Miami General which operates Miami General Hospital. The State of Florida through the Department of Insurance Division of Rehabilitation and Liquidation (the "Receiver") placed IMC into liquidation on May 4, 1987 and took over temporary operation of the hospital until July 1, 1987. After that date, if the Hospital were forced to close for more than forty-eight hours, it would lose its license. Loss of the license would necessarily result in a substantial reduction in the value of the Hospital. Faced with this scenario, Miami General's creditors filed a petition for involuntary bankruptcy on June 18, 1987, seeking the appointment of an interim trustee. An emergency hearing was held on June 19, 1987.

During the hearing, the Receiver confirmed it had been funding the operation of the Hospital since May 14, 1987. The Receiver also stated that the Hospital was significantly more valuable as an on-going operation, and thus, prior to the filing of the petition, the Department of Insurance intended to seek a purchaser for the Hospital as a continuing enterprise. However, the insurance required to operate the Hospital was due to expire by the end of June, 1987 and if the Receiver was unable to find a purchaser before July 1, 1987, it "was going to be forced to close down the Hospital."

The gravity of the situation was obvious to the Bankruptcy Judge and the parties. In short, absent the Receiver's willingness to continue operation and management, the Hospital would close within twelve days of the filing of the petition, substantially reducing its value. Jim Brennan, representing Congressman Claude Pepper, also appeared before the court. He confirmed that the Certificate of Need for the Hospital was critical. Brennan stated that if Miami General's "certificate of need is lost then there isn't anything left." In view of these enormous difficulties, the Receiver on behalf of Miami General consented to an order for relief at the hearing, one day after the petition was filed.

The Bankruptcy Judge appointed the Receiver as Trustee. The Receiver advised the Bankruptcy Court on June 23, 1987 that it rejected its appointment. The court gave the parties forty-eight hours to devise a solution, and set the matter for further hearing on June 25, 1987. The court stated that "if it can't be worked out by [June 25, 1987 at 2:00 p.m.] and we have some funds on the table to operate we will plan on closing up [the Hospital] early next week."

At the June 25, 1987 hearing, Gui Govaert was appointed Trustee. At the same time, FABT offered to fund the operation of the Hospital for two weeks for a sum not to exceed $250,000.00 provided that malpractice insurance was timely obtained. The purpose of the temporary funding was to permit the sale of the Hospital as a going concern to the highest responsible bidder. This offer was accepted by the Trustee and approved by the Bankruptcy Judge. The court also announced that it would accelerate the sale date so that it could occur during the funding period. Significantly, General Health did not object.

On June 29, 1987, First Bank N.A. and Sun Bank N.A., as co-indenture trustees

("First Mortgagees") filed an emergency verified motion for relief from stay. They asserted that Miami General had no equity in the mortgaged property due to the substantial amount of outstanding indebtedness. At the time, the first mortgage was in the principal amount of $12,000,000.00 with interest accruing at the approximate rate of $145,000.00 per month and FABT's second mortgage was in the approximate principal amount of $10,000,000.00. On July 2, 1987, FABT filed a similar emergency motion for relief from stay claiming that Miami General was indebted to it in a sum in excess of $9,451,052.20 for the same reasons.

Acting expeditiously in the hopes of realizing the going concern value of the Hospital, the Bankruptcy Judge entered his Sale Order on July 1, 1987. In the Sale Order, the court stated in pertinent part:

4. The sole substantial asset of the debtor is a hospital facility situated at 17300 N.W. 7th Avenue, Miami, Florida, together with improvements, fixtures and equipment owned by the debtor (the "Hospital"). The Hospital operates under a license (the "License") issued by the Department of Health and Rehabilitative Services for the state of Florida ("HRS") and possesses a Certificate of Need for the conduct of business as a hospital (the "Certificate of Need").

5. It appears the Hospital has been operating at a substantial loss for some time, with losses running at about $1,000,000 per month.

6. It appears since on or about May 14, 1987, the Department has been operating the Hospital.

7. It appears since on or about May 14, 1987, International Medical Centers, Inc. ("IMC"), which is the parent corporation of the Hospital, has been the subject of receivership proceedings in the Leon County Circuit Court in Tallahassee, Florida, being Case No. 87–1456, Hospital, has been the subject of receivership proceedings in the Leon County Circuit Court in Tallahassee, Florida, being Case No. 87–1456, and has been furnishing funds to the Hospital to cover operating losses.

8. It appears the Hospital is without funds to operate other than through the use of the monies supplied by the estate of IMC or use of cash collateral as to which First American Bank and Trust ("FABT") claims a secured lien.

9. The Department has ceased funding of the Hospital as of June 29, 1987.

10. The Hospital is far more valuable an asset to creditors as an operating entity than if it were closed.

11. The license for the Hospital to operate will expire on June 30, 1987, unless renewed by HRS.

12. It appears to the Court that the Hospital is encumbered by, among other liens, a first Bond Indenture upon real property fixtures, equipment and personal property in favor of First Bank of Milwaukee, Wisconsin and Sun Bank, Florida, as trustees for approximately 2,000 bondholders, with an outstanding balance of about $12,500,000, and a second mortgage on the real property and first mortgage on all personal property (subject to prior liens and leases which may exist [the "Leases"]) in favor of FABT which also has other collateral, with an outstanding balance of about $9,500,000. The amount, validity and priority of these liens have not been adjudicated by this Court.

13. By separate order of this Court, FABT has agreed to allow the use of cash collateral or fund as necessary the operations of the Hospital during the period from July 1, 1987 through the date of confirmation of a sale of the Hospital, as hereafter provided, in an amount not to exceed $250,000.00, plus up to $10,000 for the cost of advertising such sale and the reasonable fees and costs of the trustee and his counsel during such period as allowed by the Court, with the further understanding that the sum of $20,000 of such amounts shall be used to pay severance compensation of those employees who continued in the services of the Hospital during this period of time.

14. A number of persons and entities have expressed an interest in buying the Hospital as an operating entity. The

best interests of creditors will be served if the Hospital is sold as a going concern. The only alternative to an immediate sale would be to turn over or abandon the Hospital to the Bank.

15. There is a genuine emergency situation present in this case. Unless the Hospital is sold within the period of funding by FABT, its going concern value will be lost and creditors may receive no value at all and the community, including employees, will be adversely affected by the cessation of the Hospital's operations.

The court further ordered a detailed procedure to govern offers and deposits and that subsequent hearings be held for objections to the successful offer and for confirmation of sale. The court provided at paragraph 8:

The mortgagees, First Bank and Sun Bank as trustees and FABT, shall file their proofs of claim herein on or before 5:00 p.m. on Thursday, July 2, 1987, and provide copies thereof to counsel for the Trustees. Subject to the stipulation between the parties, such mortgagees may bid at the sale described hereinabove, and, if either mortgagee purchases the property being sold, such mortgagee may offset such claim against the purchase price of such property in accordance with Section 363(k) of the Bankruptcy Code.

The Stipulation referred to by the Bankruptcy Judge dated July 2, 1987 between FABT and the Trustee provided:

1. That FABT shall be permitted to credit bid at the sale of [Miami General's] property scheduled for 9:00 a.m. on July 8, 1987, pursuant to the provisions of Section 363(k) of the Bankruptcy Code.

2. The rights of FABT to credit bid as provided in Paragraph 1 above are without prejudice to the rights of the Trustee to commence an adversary proceeding or otherwise object to the validity, priority or extent of the claims of FABT on or before September 9, 1987. In the event the Trustee does not contest such claims by such time, such claims shall be deemed allowed as against the Trustee.

If however, the Trustee successfully contests FABT's claim and prevails and FABT was a successful credit bidder for the purchase of the Debtor's assets as aforesaid, without right or entitlement to such credit, FABT shall be liable to the Trustee for such damages, if any, that the Trustee establishes in an adversary proceeding to be commenced in this Court; provided, however, that FABT may satisfy, but shall not be required to satisfy, any claim of the Trustee for damages if the Trustee succeeds in invalidating FABT's liens by paying the Trustee cash in the amount of its credit bid.

FABT filed its proof of claim before 5:00 p.m. on Thursday, July 2, 1987.

Pursuant to the Sale Order, the sale of the Hospital was conducted before the Bankruptcy Judge on July 8, 1987. C & S Health Corp. ("C & S") made an offer for $16,000,000.00, with $500,000.00 to be paid in cash. C & S's offer was rejected because the Sale Order required all cash bids, with the exception of First Mortgagees and FABT, which were allowed to credit bid.

General Health made an oral offer of $14,500,000.00 subject only to the terms of the Sale Order and the express condition that the closing date be extended. FABT then bid $15,000,000.00 subject to a credit bid pursuant to Section 363(k). The credit would apply to the difference between the purchase price and the amount the Hospital was indebted to FABT. General Health's counsel acknowledged that the Sale Order permitted secured creditors to bid their claims.

After a recess, General Health raised its bid to $15,050,000.00. FABT responded by bidding $15,500,000.00 to be paid in cash at closing representing the amount of the first mortgage, and a credit against the remaining indebtedness due FABT from Miami General secured by its second mortgage. General Health expressly declined to make any further bids. The sale to FABT was consummated.

Pursuant to the Sale Order, objections to the sale were heard on July 9, 1987. At this proceeding the court noted that under Section 363(n), a trustee may avoid a sale if the sale price was controlled by an agree-

ment among potential bidders. He inquired as to whether there was a suggestion by anyone that the price among potential bidders had been controlled by the parties or otherwise manipulated. General Health's counsel responded by stating that during the recess of proceedings on July 8, 1987, General Health was approached by FABT and asked to raise its bid to $16,000,-000.00. Alternatively, counsel for General Health alleged that FABT urged General Health to bid $15,500,000.00, stating that FABT would arrange financing provided that FABT had an equity interest in the successful bid. Those offers were rejected by General Health. General Health also alleged that FABT made similar offers to C & S, whose prior $16,000,000.00 bid was rejected because it required continued financing by the secured lenders. For these reasons, General Health asked that FABT's bid be stricken and that its lower bid be accepted.

The Trustee disagreed with General Health and concluded that even if all of General Health's allegations were true, the sale to FABT should still stand because in his estimation, the Bank's "offer is better than [General Health's offer] under any circumstance." The Trustee went on to state:

That, however, Your Honor, does not take away from the fact that [FABT's] cash offer is better than anybody else's cash offer. It doesn't take away from the fact that, by stipulation, they have agreed that if they are not entitled to credit bid that they will pay to this estate either damages, or cash, in the amount of their bid.

So, we think the [Estate] is adequately protected in both respects.

FABT also addressed the issue of the negotiations which took place:

First American Bank has no written agreement to sell this hospital to any third party. First American Bank is a bank, and it is not in the business of operating a hospital, although because of these situations, [it] may be compelled to do so for a period of time.

It is no secret that the bank will attempt to sell the hospital to someone interested in operating it. This bank, other than to protect it's loan position, protect the assets, is not willing on a long-term basis to operate this hospital. So, we will be seeking a purchaser of the hospital but we will be doing it on a timeframe [sic] that is not as short as has been imposed upon this Court and the Creditors. We will continue those efforts and we are hopeful that we can, in fact, sell the hospital.

The negotiations yesterday did not involve impairing, impeding, or any way [a]ffecting the bidding process. The negotiations, as I understand them, and again Your Honor, I was not present during the negotiations, were directed to settling the matter before the Court.

The matter was not settled before the Court, the parties came back into the Court, and the parties commenced bidding per the [O]rder of [Sale] of this Court.

The court entertained the objections by General Health and two other parties and took a recess to review them. Upon resuming proceedings, the Bankruptcy Judge ruled:

The first objection, on behalf of General Health, goes to 11 US Code 363(n), which deals with control of sales by agreement among potential bidders. The purpose of that provision is to prevent the stifling of sales and the preventing of obtaining the highest and best bid.

The allegations, the petition suggesting that [FABT] was seeking to resell [its] collateral on terms, after it acquires the collateral, does not appear to impair the sale price, it possibly enhances it.

Mr. Wolff [General Health's counsel], in his oral allegations, said they tried to get the bidder to raise the bid. This is the opposite of the intention of Section 363(n), which prescribes [sic] the trying to stifle or hold down bids and does not appear to be a type of matter that is prescribed [sic] by 363(n), and the Court finds no bad faith.

With respect to the validity of the FABT's claim, the court observed that if litigation concerning that issue was successful, damages may have to be paid and added that "... how the situation would be benefited by the Trustee taking less for the property rather than more seems to escape me. I find that argument is without merit."

The court then considered the practical effect of sustaining the objections. If an objection were sustained, then FABT would not be the successful purchaser and the bid by General Health would prevail. The court observed:

> However, that sale [to General Health] could not be confirmed over the objection of [FABT] since the price is not greater than the aggregate value of [FABT's] lien position with the first mortgage position, pursuant to 11 US Code, 363(f).
>
> Hence, there would be no sale and then we would go back to the position of [FABT] coming in this afternoon at its 5:00 hearing to obtain stay relief, to foreclose its mortgage on a large vacant building where 700 people used to work. That building, without a license, would probably bring less money to everyone and be to the detriment of all, including the 700 people who would no longer have a hospital to work at, and the community would be without a hospital....

The court ultimately concluded that the better course to follow was to accept the highest bid and overrule all the objections. The court then set a supersedeas bond at $15,500,000.00 plus the statutory interest calculation. General Health did not post the supersedeas bond and has never sought a stay of the sale to FABT.

The sale of the assets to FABT was confirmed upon the terms and conditions of the Sale Order at a late afternoon hearing at 4:00 p.m. on July 9, 1987. On August 25, 1987, the sale of the assets was closed between the Trustee and FABT. FABT paid the Trustee $13,158,004.45 which was sufficient to satisfy the first mortgage and certain outstanding taxes and utilities. FABT received a credit bid in the amount of $2,341,995.55. No party sought to stay the sale of the Hospital. Subsequently, FABT publically announced the sale of the Hospital to C & S. This second sale closed on December 3, 1987.

## II.  LEGAL DISCUSSION

### FABT's Credit Bid

■ General Health contends that FABT was not entitled to credit bid the amount of its lien at the bankruptcy sale of Miami General Hospital because the Bankruptcy Judge had yet to adjudicate the lien's validity. In support of its position General Health argues that Section 363(k) of the Bankruptcy Code requires that a lien on property be adjudicated an "allowed claim" by the bankruptcy court before the lien holder, if it becomes the successful bidder, may offset this claim against the purchase price of such property. This argument is premised on the possibility that FABT's claim will be disallowed and the Trustee will be left without full payment for the bankrupt property. General Health has cited only one case directed to the issue, *Bank of Nova Scotia v. St. Croix Hotel Corp.*, 44 B.R. 277 (D.V.I.1984).

The facts of *St. Croix Hotel* are analogous to the present case. In that decision, the lien had not been adjudicated an "allowed claim" pursuant to Section 363(k) of the Bankruptcy Code prior to the sale of certain bankrupt assets. Notwithstanding the fact that the lien had not been adjudicated, the court upheld the credit bid. The court fashioned a remedy to protect the trustee by holding that the bank, as the successful bidder, would be immediately liable to the trustee in the event that the bank's lien were later disallowed. *Id.* at 279.

The logic of *St. Croix Hotel* is compelling and is useful in resolving the present controversy. Rather than baldly permitting FABT to credit bid the amount of its lien, the Bankruptcy Judge did so only in light of the Stipulation of July 2, 1987 between the Trustee and FABT. This stipulation granted FABT the right to credit bid but preserved the right of the Trustee to file an adversary proceeding or otherwise object to the extent, validity and prior-

ity of FABT's lien.[1] It is obvious therefore that the Bankruptcy Judge anticipated the potential for disallowance of the lien and fashioned a remedy to protect the trustee similar to that in *St. Croix Hotel.*

Although the optimum result would have been an adjudication of FABT's lien prior to the sale, there is no logical or legal impediment which prohibits a bankruptcy judge within his sound discretion from ordering a credit bid when confronted with an emergency situation. Here the Hospital was losing tremendous sums of money and was on the verge of closing down. The Bankruptcy Judge was under intense pressure to act expeditiously in an attempt to salvage the Hospital as a going concern. In concluding that the emergency prohibited the adjudication of the liens prior to the sale of the Hospital, Judge Cristol observed, "[i]f we want to sit around and litigate all these matters, by the time we determine everyones (sic) rights there will be nothing to deal with except a closed hospital." This Court concurs.

Moreover, as General Health correctly noted on page 24 of its brief, "[t]he bankruptcy judge's paramount responsibility is to protect the assets of the estate." The bankruptcy court accomplished this goal by expediting the sale of the Hospital so as to preserve its value as a going concern. Concomitantly, the court maintained the rights of the Trustee to challenge the lien holder's claims. In addition, FABT's credit bid escalated the bidding and enabled the Trustee to realize an additional $450,000.00 more than General Health's bid of $15,050,-000.00. In light of the genuine emergency, the Bankruptcy Judge did not commit error in fashioning an equitable remedy which permitted FABT to credit bid subject to the Trustee's right to challenge FABT's lien.[2]

1. General Health contends that the Bankruptcy Judge would lack jurisdiction to entertain an action by the Trustee to collect a debt from FABT should FABT's claim later be disallowed. Although counsel for FABT said in open court at the hearings on November 9, 1987, that it was ready at any time to adjudicate its lien before Judge Cristol, General Health further argues that the parties cannot stipulate to jurisdiction if it does not exist. Assuming General Health is correct, the Trustee could still pursue an action

## FABT's Alleged Bad Faith

■ General Health's only other colorable claim is that FABT did not bid in good faith because it improperly colluded with C & S Health Corp ("C & S"), who tendered an unqualified bid for the Hospital. General Health alleges that a secret auction took place between FABT and C & S on July 8, 1987 during a two hour recess of the Hospital sale proceedings. General Health maintains that the profit FABT earned by the subsequent sale of the Hospital to C & S for $18,000,000.00, a price substantially greater than FABT's successful bid of $15,-500,000.00, should be paid to the Trustee.

The Bankruptcy Code does not define good faith. The misconduct at a judicial sale that would destroy a buyer's good faith "involves fraud, collusion between the purchasers and other bidders or the trustee, or an attempt to take generally unfair advantage of other bidders." *In Re Abbots Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147 (3rd Cir.1986). *See also In Re Rock Industr. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978). Since there is no evidence to suggest any fraud on the part of FABT, the only issue is the alleged collusion between FABT and C & S.

FABT negotiated with both General Health and C & S during the two hour recess by offering to arrange for financing. These negotiations contemplated higher bidding and were conducted with two parties the Bankruptcy Judge knew to be potential purchasers of the Hospital. After the negotiations faltered, the bidding resumed with no contemporaneous objection by General Health at that time.

The Bankruptcy Judge specifically addressed General Health's allegations of collusion. The court found that FABT's ef-

in another forum to collect the debt. This potential cost to the Trustee is slight when balanced against the loss of a viable and operating Hospital.

2. In light of this conclusion, the Court need not decide whether General Health is engaging in an impermissible collateral attack of the Sale Order dated July 6, 1987, from which the Appellant did not appeal.

forts during the two hour recess did not impair the sale and possibly enhanced it. Indeed, instead of demonstrating the bad faith of FABT, the record is replete with evidence of FABT's good faith. As the Bankruptcy Judge stated at the afternoon hearing on July 9, 1987:

I feel everybody has worked together in good faith to achieve that end [sale of Hospital as going concern] and I have seen several very commendable examples of situations where various parties have subordinated their own personal interest, to the public interest, at potentially great financial expenses, such as the additional outlay by the Bank [FABT] of $250,000 to give us an additional 14 days to work this problem out.

In summary, the record reflects that FABT took the risk of providing the necessary temporary funding of the Hospital so that its sale would realize its going concern value. Additionally, FABT's alleged collusion appears to have been an attempt to actually stimulate the bidding by enabling other bidders to purchase the Hospital at a higher price. Accordingly, the Bankruptcy Judge correctly determined that FABT did not act in bad faith during the Sale of the Hospital. While the Court finds no merit in the substantive arguments presented, thoroughness dictates a consideration of a final procedural point.

### *The Appeal is Moot*

Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of the sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

General Health did not seek to stay the sale or post a supersedeas bond. Since General Health did not seek to stay the sale to FABT, a good faith purchaser, the Court may not interfere with the Sale. Ac-

cordingly, General Health's appeal, which seeks to vacate the sale of the Hospital, must be denied as moot. *In Re Kahihikolo*, 807 F.2d 1540 (11th Cir.1987).

### III. CONCLUSION

For the foregoing reasons, the Bankruptcy Judge's Order Confirming Sale to First American Bank and Trust and the Order Overruling Objections to Sale are hereby AFFIRMED.