In re NEW YORK TRAP ROCK CORPORATION, Lone Star Industries, Inc., et al., Debtors.

LONE STAR INDUSTRIES, INC., a Delaware Corporation, Debtor and Debtor-in-Possession, Plaintiff,

v.

COMPANIA NAVIERA PEREZ COMPANC, S.A.C.F.I.M.F.A., Sudacia, S.A., Inversora Patagonica, S.A. and Loma Negra Compania Industrial Argentina, S.A., all Argentine corporations, Defendants.

Bankruptcy Nos. 90–B–21276 to 21286, 90–B–21334 and 21335.
No. 92 ADV. 5403.

United States Bankruptcy Court, S.D. New York.

June 7, 1993.

Curtis, Mallet–Prevost, Colt & Mosle, New York City, Lynn P. Harrison, III, of counsel, for Loma Negra Compania Industrial Argentina, S.A.

Proskauer Rose Goetz & Mendelsohn, New York City, Howard Spiegler, of counsel, for debtors and debtors-in-possession.

Howard, Darby & Levin, New York City, William Phillips, of counsel, for defendants Compania Naviera Perez Companc,

S.A.C.F.I.M.F.A., Sudacia, S.A., and Inversora Patagonica, S.A.

Wachtell Lipton Rosen & Katz, New York City, for Creditors' Committee.

*DECISION ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT*

HOWARD SCHWARTZBERG, Bankruptcy Judge.

In the present adversary proceeding, the Chapter 11 debtor, Lone Star Industries, Inc. (the "debtor"), contends that Compania Naviera Perez Companc S.A.C.F.I.M.F.A. ("Perez"), Sudacia, S.A. ("Sudacia"), Inversora Patagonica, S.A. ("Patagonica"), and Loma Negra Compania Industrial Argentina, S.A. ("Loma Negra") (collectively, the "Defendants") engaged in collusive bidding violative of 11 U.S.C. § 363(n). The alleged collusive bidding related to a sale pursuant to section 363(b) and (f) of the debtor's wholly-owned subsidiary, an Argentine corporation named Compania Argentina de Cemento Portland, S.A. ("CACP"), which, in turn, owned a 50% interest in an Argentine cement company, Cemento San Martin, S.A. ("CSM").[1]

In addition, the debtor asserts that Perez, Sudacia and Loma Negra, as bidders in the sale of the debtor's stock in CACP before this court, owed a common law duty to the debtor and the court to disclose the fact that one bidder-defendant, Perez, had entered into an agreement to sell to another bidder-defendant, Loma Negra, its subsidiary's (Patagonica) 50% stock interest in CSM. The debtor further alleges that the defendant Patagonica breached CSM's By–Laws by not first offering CACP, the debtor's subsidiary, the opportunity to purchase its 50% interest in CSM, which would have given CACP ownership of 100% of CSM. Moreover, the debtor contends that Perez and Loma Negra tortiously interfered with, and induced Patagonica to breach, CSM's By–Laws. The debtor seeks to recover the amount by which the value of the CACP Stock that it sold exceeds the price at the

**1.** The following is a diagram of the relationship of the parties, excluding Loma Negra, which has no corporate relationship with any other party in this case.

bankruptcy sale, as well as punitive damages and the costs and expenses of this action including reasonable attorneys' fees.

The Defendants have moved to dismiss the entire adversary complaint pursuant to Federal Rules of Bankruptcy Procedure 7009 and 7012, which incorporate Federal Rules of Civil Procedure 9(b) and 12. The debtor has cross-moved for partial summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056, incorporating Federal Rule of Civil Procedure 56, with respect to the liability portion of its section 363(n) claim.

## FACTUAL BACKGROUND

On December 10, 1990, the debtor and certain of its subsidiaries filed with this court their respective voluntary petitions for reorganizational relief under Chapter 11 of the Bankruptcy Code and continued to manage their properties and operate their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

The debtor, and certain of the debtor's affiliates not in bankruptcy, comprise a large organization, which produce cement and clinker, and provide ready-mixed concrete, sand and gravel, crushed stone, precast concrete products and other construction materials. The debtor and its affiliated debtor corporations have approximately forty non-bankrupt affiliates manufacturing and distributing products throughout the United States, Canada and South America. The debtor maintains a corporate headquarters, for both its debtor and non-debtor affiliates, in Stamford, Connecticut.

The Defendants are all corporations organized under the laws of the Republic of Argentina. The Defendants were each served with process in Argentina in connection with this adversary proceeding.

This adversary proceeding was filed on November 20, 1992, and arises from the sale of 100% of the stock of the debtor's wholly-owned Argentine subsidiary, CACP (the "CACP Stock"). Prior to the sale of the CACP stock, CACP's capital structure

consisted of 19,700,000,000 issued and outstanding shares of stock, all of which were owned by the debtor.[2] This court approved the debtor's sale of the CACP Stock to Loma Negra by order dated August 12, 1992.

As of the date of the sale, CACP was a holding company domiciled in Buenos Aires, Argentina. CACP owned a 50% interest in the stock of an Argentine cement producer, CSM, and a 96.7% interest in the stock of an Uruguayan crushed stone producer, Canteras de Riachuelo, S.A. ("Riachuelo"). Specifically, CACP is the record and beneficial owner of 254,007,259 Class A (common) stock and 89,739,709 shares of preferred stock of CSM and 120,960 shares of Riachuelo.

Patagonica is a wholly-owned subsidiary of another defendant Perez. The defendant Sudacia is an affiliate of Perez. Perez and Sudacia acted jointly and severally as to all obligations in connection with their bid to purchase the CACP Stock pursuant to a stock purchase agreement ("Stock Purchase Agreement") dated May 9, 1992, executed by the debtor and Perez and Sudacia.

Before the sale, CSM was a corporate joint venture between CACP and the defendant Patagonica. CACP and Patagonica each owned 50% of CSM's capital stock. Therefore, through its ownership of 100% of the CACP Stock, the debtor owned a 50% interest in CSM, the company over which the present dispute arose.

The respective rights of the two joint venturers, CACP and Patagonica, were governed by a shareholders' agreement and CSM's By-Laws. Article VIII of CSM's By-Laws provides, in relevant part:

*ARTICLE VIII—TRANSFER OF SHARES*

The shareholder which proposes to sell, transfer, or otherwise dispose of all of its shares in the Company must serve notice thereof to the Board of Directors and to each of the other shareholders at the domicile registered in the Register Book

---

**2.** Lonestar Florida Cement, Inc., a wholly-owned non-debtor subsidiary, owned 0.000025% of the shares of CACP Stock.

of Shareholders, as provided in Article XIX hereof, making known the nature of the disposition that is proposed to be made, the price and terms of the proposed disposition and the identity of the person to which the disposition is to be made in order that the other shareholders may exercise their right of first refusal to purchase such shares in proportion to their shareholding and with the right to accrue.

This option must be exercised within 60 days of receipt of such notice.

. . . .

Once the 60 days have elapsed without any of the shareholders having exercised their option to purchase the shares, the Company shall have the option to acquire the shares. For this purpose the Company at an Extraordinary Shareholders' Meeting must resolve within the subsequent 60 days whether it will purchase the shares itself, at the price offered by the third party.

. . . .

If neither the Company nor any shareholders acquire the shares, upon the expiration of the above established terms, the selling shareholder shall have the right promptly thereafter to dispose of all of the shares, at a price equal to or greater than that specified in the notice referred to above and on the other terms specified in such notice, provided that if such shares are not so disposed of within 60 days after the end of such term, such shares shall once again become subject to the provisions of this Article VIII.

*CSM's By–Laws,* Art. VIII, at 7–10.

In 1992, the debtor began extensive marketing efforts to sell the CACP Stock as part of its strategy to liquidate its interests in the South American cement market. *Adversary Complaint,* at ¶ 14. The debtor offered the CACP Stock for $55 million to approximately 33 potential purchasers from among the world's major cement producers including those located in Latin America, Europe and the Pacific Rim. Of those initially contacted, six entities entered into confidentiality agreements with the debtor and received detailed information regarding the sale. *Id.* at ¶ 15.

This limited interest in the CACP Stock was due to the fact that any purchaser of the stock would not have full control over CSM, but rather, would share ownership with Patagonica and be subject to the terms and conditions of CSM's By–Laws and the Shareholders' Agreement. *Id.* at ¶ 17; *Martin Affidavit,* at ¶ 10.

Following discussions with the six entities signing confidentiality agreements, Perez and Sudacia, acting jointly, emerged as the only party expressing serious interest. On May 9, 1992, the debtor entered into the Stock Purchase Agreement with Perez and Sudacia, acting jointly and severally as to all obligations undertaken under the Stock Purchase Agreement.

The Stock Purchase Agreement provided that Perez and Sudacia would purchase the CACP Stock from the debtor for $36 million. The debtor was aware that this transaction would, in effect, give Perez the controlling interest in CSM. Under the Stock Purchase Agreement, the debtor was bound "to consummate" the sale of the CACP Stock to Perez and Sudacia, subject to three important limitations: (1) Perez and Sudacia were good faith purchasers; (2) the bankruptcy court approved the sale; and (3) no other entity overbid Perez and Sudacia by at least $1 million. *Stock Purchase Agreement Between the Debtor and Perez and Sudacia,* at ¶¶ 3.1 & 5.3 (attached as Exhibit B to Debtor's Motion to Approve Terms, etc.). Accordingly, if no other entity were to overbid Perez and Sudacia by at least $1 million, Perez was a good faith purchaser, and the court authorized the sale to Perez and Sudacia, the debtor was bound to sell the CACP Stock to Perez and Sudacia. At that point, the debtor could not withdraw the CACP Stock from the bankruptcy sale.

On May 14, 1992, the debtor filed an application with this court, as required by paragraph 5.1 of the Stock Purchase Agreement, for an order approving the terms for competing offers, overbid procedures and related provisions in connection with the debtor's sale of the CACP Stock.

On June 4, 1992, after a hearing on this motion, the court signed an order approving bidding procedures and related provisions. The order required each bidder to submit a written bid at least three days prior to the sale, submit a bid substantially similar to the Stock Purchase Agreement, overbid the highest bidder by at least $1 million, prove financial capability, promise confidentiality of information relating to the value of the CACP Stock, and promise to close within a certain time period. The bidding procedure order does not contain a provision requiring a bidder to disclose to the debtor or the court any relationship such bidder may have with any other bidder.

Notice of the sale of the CACP Stock to Perez, subject to higher and better offers, was published in the national editions of *The New York Times* and *The Wall Street Journal*, and in Argentina in *El Cronista Commercial* (in Spanish).

Thereafter, Petroquimica Comodoro Rivadavia S.A. ("Petroquimica"), another Argentine corporation and one of the initial six entities to enter into a confidentiality agreement with the debtor, expressed interest in the CACP Stock. On July 13, 1992, Loma Negra emerged, entered into a confidentiality agreement with the debtor, and received information regarding CACP and CSM.

On July 15, 1992, Petroquimica bid $37 million, one million more than Perez's bid, for the CACP Stock, but conditioned its bid on satisfactorily completing due diligence with regard to CACP and CSM. Petroquimica is unrelated to any other bidder and is not one of the Defendants.

Nine days later, on July 24, 1992, Loma Negra submitted to the debtor a bid to purchase the CACP Stock for $38 million, one million more than Petroquimica's bid and two million more than Perez's bid.

On August 6, 1992, Patagonica agreed to sell its 50% interest in CSM to the defendant Loma Negra for $55 million. *Salinas Affidavit*, at ¶ 2.

On August 11, 1992, one day before this court held a hearing to approve the debtor's sale of the CACP Stock, Petroquimica withdrew its bid of $37 million, leaving only Perez and Loma Negra as active bidders.

On August 12, 1992, this court authorized the sale of the CACP Stock from the debtor to Loma Negra for $38 million. The closing of Loma Negra's purchase of the CACP Stock occurred in New York. Following the closing of the CACP Stock purchase with the debtor, Loma Negra owned 100% of CSM. The debtor alleges that Loma Negra did not inform it prior to purchasing the CACP Stock that it had already purchased Patagonica's 50% interest in CSM.

On August 13, 1992, "La Bolsa," a Buenos Aires newspaper, published a letter from Perez to the Buenos Aires Stock Exchange stating that Perez had sold its subsidiary's (Patagonica's) 50% interest in CSM to Loma Negra for $55 million. *Martin Affidavit* (Exhibit O).

In its First Claim for Relief, the debtor contends that Perez, Patagonica's corporate parent, and Loma Negra, the only remaining bidder participating in the bankruptcy sale, had secretly entered into an agreement in violation of 11 U.S.C. § 363(n). Pursuant to this secret agreement, Perez was to sell its 50% interest in CSM to Loma Negra for $55 million and then drop out of the bidding. *Adversary Complaint*, at ¶¶ 2, 32–34, and 40–41. As a result, Loma Negra, having no other competing bidder at the bankruptcy sale, was able to purchase the debtor's CACP Stock for $38 million, which was much less than the $55 million Loma Negra paid Perez for an equivalent amount of CACP stock. The debtor has stated its position as follows:

> 33. If Lone Star and the Court had been informed that Loma Negra was willing to purchase or had purchased Perez's subsidiary's interest in CSM for 55 million dollars, Lone Star would not have agreed to sell its CACP Stock to Loma Negra for only 38 million dollars and the court would not have approved the Sale, for the CACP Stock was at least as valuable to Loma Negra as Perez's interest in CSM: ownership of all the CACP

Stock gave Loma Negra control of CSM, in addition to virtually all of the stock of Riachuelo, the Uruguayan crushed stone producer.

*Adversary Complaint*, at ¶ 33.

The debtor's First Claim for Relief seeks to recover from Perez, Sudacia and Loma Negra $17 million, which is the difference between the $55 million price Perez sold its 50% interest in CSM to Loma Negra and the $38 million price the debtor sold the CACP Stock to Loma Negra. The debtor also seeks attorneys' fees and expenses, and punitive damages of at least $10 million. The court notes at the outset that the sale of the CACP Stock for $38 million not only included CACP's ownership interest in CSM, but CACP's 96.7% ownership interest in the Uruguayan crushed stone producer, Riachuelo, which the debtor concedes was worth approximately $1 million dollars. *Martin Affidavit*, at ¶ 6.

Dr. Juan Jose Salinas, the "Director Legal" of both Perez and Patagonica, asserts that there was no oral or written agreement involving Patagonica, Perez or any of its affiliates regarding the sale of the debtor's CACP Stock. He contends that there was no agreement that Perez would drop out of the bidding or that any bidders would be excluded from the bidding. He also states that neither Perez nor any affiliate agreed to control or otherwise affect the price of the CACP Stock at the sale in the bankruptcy court. *Salinas Affidavit*, at ¶¶ 2–3.

The debtor's Second Claim for Relief seeks recovery from Patagonica for breach of contract based on Patagonica's failure to offer CACP the opportunity to purchase its 50% interest in CSM as required by CSM's By–Laws. *Adversary Complaint*, at ¶¶ 42–43. In its Third Claim for Relief, the debtor seeks to recover from Perez, Sudacia and Loma Negra for tortiously interfering with, and inducing Patagonica to

breach, CSM's By–Laws. *Id.* at 44–45. The debtor seeks damages of at least $17 million for each of the Second and Third Claims for Relief.

The debtor's Fourth Claim for Relief seeks to recover from Perez, Sudacia and Loma Negra at least $17 million, alleging that these entities had a common law duty to disclose to the debtor and the court the existence of the Stock Purchase Agreement between Perez and Loma Negra. *Id.* at ¶¶ 46–47.

■ The Defendants have raised several affirmative defenses in their motion to dismiss the complaint. First, the Defendants assert that the court lacks jurisdiction over the debtor's non-bankruptcy claims, which concern an Argentine contract between Argentine companies concerning the Argentine operations of another Argentine company. Second, the Defendants argue that the court lacks personal jurisdiction over each of the Defendants because none has minimum contacts with the forum in connection with the instant claims. Furthermore, the Defendants state that the debtor lacks standing to raise these claims because under both Argentine and United States law, the debtor was not a party to, nor an intended beneficiary of, the shareholders' agreement between CACP and Patagonica. Finally, the Defendants contend that the debtor has failed to plead its fraud claim with the particularity required by Federal Rule of Civil Procedure 9(b), as incorporated by Federal Rule of Bankruptcy Procedure 7009.[3]

## DISCUSSION

*Debtor's Motion for Summary Judgment on its Section 363(n) Claim*

■ This case is proof positive that the whole is greater than the sum of its parts. The heart of this dispute concerns the debtor's failure to capitalize on the sale of the

---

**3.** The court will not consider the Defendants' request to dismiss the debtor's contract claim and tortious interference claim for failure to state a claim, and the Defendants' request that this court abstain, as these objections were raised for the first time in the Defendants' reply brief. Motions "must be made in moving pa-

pers," not in a reply brief. *Bridges v. Eastman Kodak Co.*, 800 F.Supp. 1172, 1179 n. 7 (S.D.N.Y. 1992). *See Glass v. Coughlin*, 1991 WL 102619, at *4 n. 1 (S.D.N.Y.1991) (court would not consider argument raised for first time in reply brief and not mentioned in moving defendants' moving brief or notice of motion).

controlling 50% interest in CSM. The debtor asserts that had it known that the sale of the CACP Stock in this court constituted the sale of the controlling interest in CSM, rather than simply a one-half ownership interest in the Argentine cement company, the debtor would not have parted with the CACP Stock for a mere $38 million. Instead, the debtor would have held out for the true value which is reflected in the $55 million price Loma Negra paid to Patagonica, Perez's subsidiary. Toward this end, and in response to the Defendants' motion to dismiss the entire adversary complaint made pursuant to Federal Rules of Bankruptcy Procedure 7009 and 7012, the debtor has cross-moved for partial summary judgment on the liability portion of its section 363(n) claim pursuant to Federal Rule of Bankruptcy Procedure 7056.

In ruling on a motion for summary judgment, the court must review the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, to determine if there is no genuine issue as to any material fact so that the moving party is entitled to a judgment as a matter of law. Federal Rule of Bankruptcy Procedure 7056; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 599, 106 S.Ct. 1348, 1362–63, 89 L.Ed.2d 538 (1986). The nonmoving party may oppose a summary judgment motion by making a showing that there is a genuine issue as to a material fact in support of a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

■ The objective of a bankruptcy sale, and therefore concomitant duty of a debtor with respect to such a sale, is to obtain the highest price or best overall benefit for the estate. *In re Atlanta Packaging Prods., Inc.,* 99 B.R. 124, 131 (Bankr.N.D.Ga.1988); *In re Wingspread Corp.,* 92 B.R. 87 (Bankr.S.D.N.Y.1988). In the present case, the court must balance the need to maintain integrity in the bankruptcy sale process against a non-debtor's right to convey non-debtor property, which concededly may impact on the sale price of the debtor's property.

The debtor focuses the court's section 363(n) inquiry in this case by stating that if Loma Negra had disclosed at the bankruptcy sale that pursuant to the Stock Purchase Agreement Perez had already sold its 50% interest in CSM to Loma Negra for $55 million and that Perez had dropped out of the bidding leaving only Loma Negra's bid of $38 million, this court would not have approved the sale of the CACP Stock to Loma Negra. *Debtor's Reply Memorandum,* at 2. The debtor contends it believed that the sale of the CACP Stock was such that any purchaser was only receiving a 50% interest in CSM, when, in reality, the debtor was deprived of receiving the "control premium" because the sale of the CACP Stock in this court included the controlling 50% interest in CSM.[4] *Id.* at 3–4.

Section 363(n) states:

(n) The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into

---

**4.** *See City National Bank v. American Commonwealth Financial Corp.,* 801 F.2d 714, 715 n. 1 (4th Cir.1986) ("[T]he value of a controlling position in a corporation is worth more on a per share basis than a non-controlling interest. This enhanced value is termed a control premium.") (citation omitted), *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1301, 94 L.Ed.2d 157 (1987).

such agreement in willful disregard of this subsection.

11 U.S.C. § 363(n). The debtor has not chosen to avoid the sale of the CACP Stock to Loma Negra, as section 363(n) permits, but rather, has requested relief under the alternative prong of the section. Specifically, the debtor seeks at least $17 million as the difference between the sale price of the CACP Stock, $38 million, and the price Perez sold its 50% interest in CSM to Loma Negra, $55 million.

This case does not present the classic scenario of collusive bidding that section 363(n) was enacted to remedy. That is, this is not a case where the sale price of the asset sold by the debtor was "controlled" as a result of "an agreement among potential bidders" to fix the sale price of the debtor's property. See, e.g., Ramsay v. Vogel, 970 F.2d 471 (8th Cir.1992). Instead, the debtor argues that the potential bidders entered into an agreement relating to non-debtor property, namely Patagonica's 50% interest in CSM, that, in turn, affected the price of the debtor's property, the CACP Stock, and pursuant to which one bidder, Perez, dropped out. This court's research has not revealed any case involving a section 363(n) claim in which the collusive bidders were alleged to have affected the sale price of the debtor's asset as a result of a transaction involving non-debtor property.

At first blush, the debtor's claim is appealing, however, upon closer scrutiny, section 363(n) offers the debtor little comfort in what must be characterized as a failure to possess negotiating leverage, rather than a case of collusion. The timing of the salient events is, of course, critical.

The debtor filed this bankruptcy and decided to divest itself of its interests in the South American cement markets. As a result, the debtor began marketing the CACP Stock, which included a 50% interest in CSM. On May 9, 1992, the debtor entered into the Stock Purchase Agreement with Perez pursuant to which the debtor was bound to sell Perez the CACP Stock for $36 million, subject to certain conditions, including that Perez was a good faith purchaser, not overbid at the bankruptcy sale and the court approve.

At the time Perez and the debtor entered into the Stock Purchase Agreement on May 9, 1992, the debtor concedes that it was only selling a 50% interest in CSM to Perez because Patagonica did not sell its 50% interest to Loma Negra until August 6, 1992. The debtor has not alleged in the adversary complaint that Perez and Loma Negra were colluding as early as May of 1992, nor has the debtor alleged that Perez did not meet the good faith purchaser requirement set forth in the Stock Purchase Agreement.[5] As of May 9, 1992, Perez was simply an interested buyer who had entered into a Stock Purchase Agreement, in an attempt to bind the debtor to a particular price, subject to certain conditions. In fact, Perez was in a unique position because as the corporate parent of Patagonica, the other 50% owner of CSM, Perez was the only party that could purchase from the debtor and thereby obtain the controlling interest. Every other bidder would purchase having to share ownership. The debtor was, of course, aware that Perez was purchasing the controlling interest of CSM at the time the debtor entered into the Stock Purchase Agreement with Perez under which the debtor agreed to sell the CACP Stock for $36 million.

The next critical event in the case occurred when Loma Negra submitted to the debtor a bid of $38 million for the CACP Stock. Again, at this point, the debtor does not allege in its adversary complaint, nor do the pleadings reflect, that Loma Negra, Perez and Patagonica, were in collusion. Loma Negra was simply an interested party bidding for a 50% interest in CSM.

5. The term "good faith purchaser" is not defined in the Bankruptcy Code. "The misconduct at a judicial sale that would destroy a buyer's good faith 'involves fraud, collusion between the purchasers and other bidders or the trustee, or an attempt to take generally unfair advantage of other bidders.'" In re Miami General Hospital, Inc., 81 B.R. 682, 688 (S.D.Fla.1988) (quoting In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir.1986)).

Thirteen days later, Patagonica sold to Loma Negra for $55 million its 50% interest in CSM, which was the controlling interest in CSM, assuming that Loma Negra's $38 million bid was not overbid at the bankruptcy sale. It was Patagonica that could afford to hold out for a $17 million premium for its 50% interest, not the debtor. Perez, Patagonica's parent, already had the debtor committed to a $36 million sale price. It was the only party that could receive the entirety of CSM at the bankruptcy sale. If Loma Negra purchased Patagonica's 50% interest, then Perez would have no more reason to participate in the bankruptcy sale and would drop out. Loma Negra would only need to overbid Petroquimica, who had bid $37 million, subject to completion of due diligence. The adversary complaint does not name Petroquimica as a defendant, nor does the debtor state the reason that Petroquimica dropped out of the bankruptcy sale. The court draws no inferences and makes no conclusions based on Petroquimica's non-participation.

Consequently, Patagonica had the leverage in this case, not the debtor. Patagonica exerted its leverage, with the help of its parent, Perez, in such a way that it capitalized on its ability to sell the controlling interest in CSM. Its conduct was not violative of section 363(n) of the Bankruptcy Code. As one treatise states:

> Any one who has an interest in property is privileged to dispose of it in the way that seems most advantageous to him. This privilege is one of the most valued elements of ownership, and is not affected by the fact that the property in which he has an interest is being subjected to public sale ... by trustees in bankruptcy....

6A Corbin, *Contracts*, § 1468, at 574.

The debtor relies upon *Ramsay v. Vogel*, 970 F.2d 471 (8th Cir.1992). There, a Chapter 7 trustee brought a section 363(n) action against two bidders who had secretly agreed that one would drop out of the trustee's sale of the debtor's real property, but that the withdrawing bidder would have the option to purchase for $350,000.00 the successful bidder's right to buy the property. After the sale, the withdrawing bidder exercised his option. The court found that "the effect of the collusion ... was to produce for the bankrupt estate an amount that was at least $350,000.00 less than the fair market value of the property." *Id.* at 474. Consequently, although the property cost the ultimate purchaser $350,000.00 more than was bid, the estate did not receive this additional amount, but instead was received by another potential purchaser.

*Ramsay* is distinguishable from the present case for several reasons. First, in *Ramsay*, the bidders conspired to control the price of the debtor's property for sale under the auspices of the bankruptcy court. In the present case, the conspiracy in question relates to conduct involving an agreement to purchase one bidder's property which may have affected the sale price of the debtor's property. Second, and more importantly, in *Ramsay*, the price of the sale property did not depend upon the ownership of non-debtor property. Specifically, in *Ramsay*, there was no premium for owning the debtor's property in conjunction with other related property that would inure to benefit of a purchaser that could obtain both the debtor's property and the related non-debtor property. Third, in *Ramsay*, the secret agreement had as a premise, that one bidder would withdraw from the bidding *even though the withdrawing bidder was still interested in obtaining the sale property* because the withdrawing bidder could exercise his option to buy from the successful bidder after the sale. In the present case, the debtor's claim that Loma Negra and Perez conspired such that Perez agreed to drop out of the bidding is inapposite to the facts in *Ramsay*. Here, Perez dropped out of the bidding because it was no longer interested in the debtor's property, having sold its own indirect interest (through Patagonica, its wholly-owned subsidiary).

The debtor also states that had it known prior to the bankruptcy sale that Loma Negra had purchased Patagonica's 50% interest in CSM, the debtor would have

held out at the bankruptcy sale for a substantially higher sale price. This position misunderstands the essential difference between an "auction" and a "sale." The debtor submits that it conducted an auction, when instead, it held a sale. Under an auction, the debtor does not begin with a signed contract of sale subject to overbids, which it must honor if there are no overbids. An auction is an event where a debtor offers up an asset of the estate to any bidder and may set the terms of the auction, such as a required minimum price and a right specifically to withdraw the asset from the sale if the debtor does not obtain an acceptable bid. This, the debtor did not do. The debtor was bound by the very terms of its own sale and the Stock Purchase Agreement with Perez to sell, and it could not withhold the CACP Stock from the bankruptcy sale. It also could not require Loma Negra to overbid Perez by anything more than $1 million.

While the Defendants have not moved for summary judgment, but rather dismissal, this court may grant summary judgment to the Defendants because the debtor's motion for summary judgment searches the pleadings. *Viger v. Commercial Ins. Co. of Newark, N.J.*, 707 F.2d 769, 774 (3d Cir.1983); *Morrissey v. Curran*, 423 F.2d 393 (2d Cir.), *cert. denied*, 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796 (1970); *In re Kavanakudiyil*, 143 B.R. 598 (Bankr.S.D.N.Y.1992); *In re Soly Srour*, 138 B.R. 413, 419 (Bankr.S.D.N.Y.1992).

The Second Circuit has held that a court need not give notice of its intention to enter summary judgment against the non-moving party. *Abrams v. Occidental Petroleum Corp.*, 450 F.2d 157, 165–66 (2d Cir.1971), *aff'd sub nom.* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). Furthermore, the Second Circuit has noted in affirming the propriety of granting summary judgment for the non-moving party that where a defendant moves for summary judgment and the court grants summary judgment for

the non-moving plaintiff, the defendant may suffer prejudice because its papers may be directed at demonstrating how the plaintiff, who has the burden of persuasion, cannot establish a prima facie case. Consequently, the defendant may not necessarily include all evidence that might be presented at trial in its defense. *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991). The *Coach* court stated that had the plaintiff "initially moved for summary judgment, the [defendant] would have been on notice to incorporate all rebutting evidence available to them." *Id.* at 167.

This is precisely the posture of the present case. The plaintiff-debtor has cross-moved for summary judgment and was therefore on notice to include all evidence available in support of its motion. Moreover, the *Coach* court found that any procedural deficiency attendant to granting summary judgment in favor of the non-moving party is "greatly diminished" if the "determination is based on issues identical to those raised by the moving party." *Id.* In the present case, the court will grant summary judgment for the Defendants and dismiss the debtor's first cause of action brought pursuant to 11 U.S.C. § 363(n) based on the 363(n) issues raised by the debtor.[6]

The debtor's brief and reply brief are replete with allegations that if the Defendants' conduct in this case goes unpunished, the integrity of the bankruptcy sale process will be tarnished. The court's holding in this case has provided the protection that the process requires. Without such a holding, prospective purchasers will not participate in bankruptcy sales for fear that any finality obtained may be easily upset by showing, for example, that a transaction involving certain bidders and non-debtor property had an adverse effect on the sale price of the debtor's property.

In a sense, the debtor's motion for summary judgment has had a boomerang ef-

---

6. Alternatively, the court finds that under the standard applicable to the Defendants' motion to dismiss, the debtor has not stated a claim upon which relief could be granted. The debtor cannot prove a set of facts, consistent with the allegations contained in the complaint, that establishes a claim under 11 U.S.C. § 363(n).

fect. The court notes that it is not easy to throw a cement boomerang and, in fact, may only be possible in the pages of judicial opinions.

### The Defendants' Motion to Dismiss the Adversary Complaint

The Defendants have moved to dismiss the debtor's complaint for failing to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b). A claim may be dismissed only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 2905-06, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint must be viewed in a light most favorable to the pleader and its allegations must be accepted as true. *Easton v. Sundram,* 947 F.2d 1011, 1015 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992); *Luce v. Edelstein,* 802 F.2d 49, 52 (2d Cir.1986); *Fine v. City of New York,* 529 F.2d 70, 75 (2d Cir.1975).

### The Bidders' Common Law Duty to Disclose their Relationship

■ While the Defendants have moved to dismiss all of the debtor's non-bankruptcy claims based on the lack of personal jurisdiction and other procedural grounds, the court will consider the substance of the debtor's fraudulent concealment claim. The Defendants have moved under Federal Rules of Bankruptcy Procedure 7009 and 7012, incorporating Federal Rules of Civil Procedure 9 and 12, to dismiss the debtor's fourth cause of action which seeks damages of at least $17 million dollars from Perez, Sudacia and Loma Negra for fraudulently concealing from the debtor Loma Negra's purchase of Patagonica's interest in CSM. The Defendants argue that the debtor has not sufficiently pleaded the elements of a claim for fraudulent concealment. Under New York law,[7] the elements of a fraudulent concealment are: (1) a relationship between contracting parties that creates a duty to disclose, (2) knowledge of material facts by a party bound to make such disclosures, (3) nondisclosure, (4) scienter, (5) reliance, and (6) damage. *Congress Financial Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 473 (S.D.N.Y.1992); *In re Domestic Fuel Corp.,* 79 B.R. 184, 193 (Bankr.S.D.N.Y.1987).

■ The debtor's fraud allegation is based upon nondisclosure and therefore, the debtor must establish that Loma Negra, Perez and Sudacia had a duty to speak. *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). New York law imposes a duty to disclose material facts (1) if a fiduciary relationship exists between the parties, or (2) where one party has superior knowledge, not readily available to the other party, and knows that the other party is acting on the basis of mistaken information. *Aaron Ferer & Sons, Ltd.*

---

7. A federal court must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *accord Continental Cas. Co. v. Pullman, Comley et al.,* 929 F.2d 103, 105 (2d Cir.1991); *Transatlantic Cement v. Lambert Freres et cie.,* 462 F.Supp. 363 (S.D.N.Y. 1978). Therefore, because New York is the forum state in this instance, this court must rely on New York's rules governing choice of law. *In re Golden Distributors, Ltd.,* 134 B.R. 750, 755 (Bankr.S.D.N.Y.1991). Under New York choice of law principles, this court must apply the substantive tort law of the state having the most significant relationship with the occurrence and with the parties. *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.), *cert. denied,* 488

U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Golden Distributors,* 134 B.R. at 755; *Babcock v. Jackson,* 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).

In the present case, the debtor maintains a principle place of business in New York. The bankruptcy sale of the CACP Stock, which is the subject of this litigation, was conducted in New York. The acts concerning the alleged tort, the violation of a bidder's common law duty to disclose, occurred in New York. Consequently, this court must apply the substantive tort law of New York in determining the merits of the debtor's fourth cause of action for breach of the alleged common law duty to disclose the prior sale of Patagonica's interest in CSM to Loma Negra.

*v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984).

■ The debtor has not alleged the existence of a fiduciary obligation, but instead seeks to invoke the second theory, the so-called "special facts" doctrine. *Debtor's Memorandum of Law*, at 43.[8] Under the "special facts" doctrine, a plaintiff must show: (1) one party had superior knowledge, (2) that knowledge must not be readily available to the other party, and (3) the party with the knowledge must know that the other party is acting on the basis of mistaken knowledge. *Congress Financial*, 790 F.Supp. at 473. The plaintiff's failure to establish any one element bars application of the doctrine.

The Second Circuit has refused to acknowledge a duty to disclose pursuant to the "special facts" doctrine where the information allegedly concealed was not pursued by the plaintiff. *Aaron Ferer*, 731 F.2d at 123–24. In *Congress Financial*, a defendant-purchaser of a meat packing operation filed a counterclaim based on fraudulent concealment. The purchaser argued that the plaintiff-finance company had a duty to disclose that the meat packing operation's inventory was overstated because had the purchaser known this it never would have entered into the transaction to purchase. The court held that the purchaser's access to the books and records of the meat packer, but its failure to "exercise diligence to discover the allegedly omitted information," precludes it from claiming fraudulent concealment. *Congress Financial*, 790 F.Supp. at 474.

■ In the present case, the debtor requested that this court set the terms and conditions of the bankruptcy sale, which this court did by order dated June 2, 1992. The debtor required all bidders to disclose their bid in writing at least three days prior to the sale, submit a bid substantially similar to the Stock Purchase Agreement, overbid by at least $1 million, submit with their bid proof of financial capability, promise confidentiality of information relating to the value of the CACP Stock, and promise to close within a certain time period. These requirements are detailed and require a bidder to provide the debtor with substantial information, including financial information regarding the bidder's own company. Nevertheless, the bidding procedure order does not contain a provision requiring a bidder to disclose to the debtor or the court any relationship such bidder may have had with any other bidder. While the debtor may not have been in a position to capitalize on the "control premium," one aspect of this transaction the debtor exerted substantial control over was the terms and conditions of the section 363 sale. Accordingly, the debtor, who established a sophisticated mechanism for conducting this bankruptcy sale, may not assert a claim for fraudulent concealment because section 363 does not require bidders to disclose the sale of non-debtor property between each other and because the debtor waived the right to such information as it simply failed to include a provision requiring bidders to disclose any relationship they had with each other. Therefore, the Defendants' motion to dismiss the debtor's fourth claim for fraudulent concealment will be granted.

8. The debtor also briefly argues that Perez had a fiduciary duty to the debtor, pursuant to the Joint Venture Agreement between CACP and Patagonica, to fully disclose its intention to sell its 50% interest in CSM to Loma Negra. *Debtor's Memo in Support of its Cross–Motion for Partial Summary Judgment*, at 44. While Perez's failure to offer the debtor the first right to purchase Patagonica's 50% interest may be a breach of the Joint Venture Agreement, the debtor may not transform a contractual duty to offer a first right of refusal into a fraud claim. *See Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1449 (S.D.N.Y. 1986).

The debtor also believes that section 363(n) confers upon the Defendants a duty to disclose the existence of their agreement to transfer Patagonica's interest in CSM to Loma Negra. *Debtor's Memo*, at 44. This position is clearly contrary to the plain meaning of section 363(n) as that section contains no language requiring such disclosure. The United States Supreme Court has recently emphasized the need to give effect to the plain meaning of the Bankruptcy Code. *Union Bank v. Wolas (In re ZZZZ Best Co., Inc.)*, — U.S. —, —, 112 S.Ct. 527, 528, 116 L.Ed.2d 514 (1991). This court therefore declines to adopt the debtor's proffered interpretation of section 363(n).

### Lack of Personal Jurisdiction Over Defendants

The Defendants have moved to dismiss the adversary complaint pursuant to Federal Rule of Bankruptcy Procedure 7012, incorporating Federal Rule of Civil Procedure 12(b)(2), based on this court's lack of personal jurisdiction over them. The debtor must establish a *prima facie* showing of personal jurisdiction because the Defendants have challenged jurisdiction by a Rule 12(b)(2) motion. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *Capital Records, Inc. v. Optical Recording Corp,* 810 F.Supp. 1350, 1352 (S.D.N.Y.1992).

Because the court has already resolved the debtor's first and fourth claims for relief, the court will consider the Defendants' motion to dismiss in connection with the second and third causes of action in the adversary complaint.[9] In its second claim, the debtor seeks to recover from Patagonica for breach of CSM's By–Laws. The debtor's third claim for relief seeks recovery against Perez, Sudacia and Loma Negra for tortious interference with, and inducing Patagonica to breach, CSM's By–Laws.

 The debtor alleges four bases of personal jurisdiction over the Defendants with regard to its non-bankruptcy claims: (1) 28 U.S.C. § 1334(b); (2) pendent personal jurisdiction; (3) minimum contacts; and (4) New York's long-arm statute. It is well-settled that the theory of minimum contacts upon which personal jurisdiction is typically established is inapplicable in bankruptcy cases. *In re Gex Kentucky, Inc.,* 85 B.R. 431 (Bankr.N.D.Ohio 1987); *In re Bell & Beckwith,* 41 B.R. 697 (Bankr. N.D.Ohio 1984); *In re Schack Glass Industries Co., Inc.,* 20 B.R. 967 (Bankr.S.D.N.Y. 1982). More specifically, a bankruptcy court does not start its analysis with this question, although, as this court will dis-

cuss below, the Defendants' minimum contacts with the forum may become a critical aspect of determining whether the court has personal jurisdiction over the Defendants. *In re Ace Pecan Co., Inc.,* 143 B.R. 696 (Bankr.N.D.Ill.1992) (court returns to minimum contacts question).

The Supreme court has made it clear that in order to decide whether a federal court may exercise personal jurisdiction over a defendant, the court must determine whether the procedural requirement of service of the summons has been satisfied. *Omni Capital International v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987). The Supreme Court continued:

> "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." (*Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444–445 [66 S.Ct. 242, 245–246, 90 L.Ed. 185] (1946)). Thus, before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. *There also must be a basis for the defendant's amenability to service of summons.* Absent consent, this means there must be authorization for service of summons on the defendant.

*Id.* (emphasis added).

In connection with a matter pending in a bankruptcy court, Federal Rule of Bankruptcy Procedure 7004(e) governs service of process in a foreign country, and it states:

> **(e) Service on Debtor and Others in Foreign Country.** The summons and complaint and all other process except a subpoena may be served as provided in Rule 4(d)(1) and (d)(3) FRCivP in a foreign country (A) on the debtor, any per-

---

9. The Defendants have not objected to this court's exercise of personal jurisdiction in connection with the debtor's section 363(n) claim and therefore this court will not consider the issue. In any event, the court need not consider whether it may exercise personal jurisdiction over the Defendants with regard to the section

363(n) claim as the court has resolved the section 363(n) claim substantively. Similarly, the court has found no common law duty to disclose, and therefore need not consider whether the court has personal jurisdiction over the Defendants with regard to the debtor's fourth claim.

son required to perform the duties of a debtor, any general partner of a partnership debtor, or any attorney who is a party to a transaction subject to examination under Rule 2017; or (B) on any party to an adversary proceeding to determine or protect rights in property in the custody of the court; or (C) on any person whenever such service is authorized by a federal or state law referred to in Rule 4(c)(2)(C)(i) or (e) FRCivP.

Fed.R.Bankr.P. 7004(e).

■ Subsection (A) of Rule 7004(e) is clearly inapplicable as it applies to the debtor and parties somehow related to the debtor. Under subsection (B), a party is amenable to service of process if such service seeks to "determine or protect rights in property in the custody of the court." While "property" is a broadly defined term under the Bankruptcy Code, the issue before the court does not require that the court interpret the meaning of "property" under the Bankruptcy Code. Instead, "the questions involve the limits of personal jurisdiction and whether service of process can be made on a foreign defendant in a foreign country in this proceeding...." *In re All American of Ashburn, Inc.*, 78 B.R. 355, 356–57 (Bankr.N.D.Ga.1987). In *All American*, the court held that "7004(e)(B) was contemplated to mean some form of tangible property in the custody of the court which gives rise to jurisdiction *in rem* to determine even a foreign defendant's rights in such property." *Id.* at 357. Therefore, the court concluded that a trustee's preference complaint was intangible property and not "property" within the meaning of Rule 7004(e)(B).

In the present case, the debtor's second and third claims for relief do not seek to protect property or determine rights in property in the custody of the court. The debtor's second claim for relief against Patagonica seeks damages based upon breach of CSM's By–Laws, which is at best intangible property and probably better characterized as belonging to CACP, a non-debtor entity not before this court. Although the debtor contends that the CACP Stock is "property" under the custody of this court,

the CACP Stock is entirely separate from any intangible right CACP, as an entity, may have to collect on a breach of contract claim. If CACP corporate property in Argentina, such as a corporate building, had been damaged, the debtor would not have sued in this court. Therefore, subsection (B) does not confer personal jurisdiction upon this court with respect to the debtor's second claim for relief against Patagonica for breach of CSM's By–Laws. The same may also be said of the debtor's third claim for relief against Perez, Sudacia and Loma Negra for tortiously interfering with, and inducing Patagonica to breach, CSM's By–Laws. Accordingly, the court finds the debtor's third claim is also intangible property and therefore not property within the meaning of subsection (B).

■ Subsection (C) of Rule 7004(e) provides for service in a foreign country when authorized by federal or state law under Federal Rule of Civil Procedure 4(c)(2)(C)(i) or (e), which provides:

> (C) A summons and complaint may be served upon a defendant of any class referred to in paragraph (1) or (3) of subdivision (d) of this rule—
> (i) pursuant to the law of the State in which the district court is held for the service of summons or other like process upon such defendant in an action brought in the courts of general jurisdiction of that State....

(e) Summons: Service Upon Party Not Inhabitant of or Found Within State. Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party

not an inhabitant of or found within the state, or (2) for service upon or notice to such a party to appear and respond or defend in an action by reason of the attachment or garnishment or similar seizure of the party's property located within the state, service may in either case be made under the circumstances and in the manner prescribed in the statute or rule. Fed.R.Civ.P. 4(c)(2)(C)(i) & (e).

The first sentence of Rule 4(e) relates to service of process on an out-of-state defendant when a federal statute so authorizes. The next sentence permits service on an out-of-state defendant pursuant to state law, meaning the long-arm statute of the state in which the federal court sits. *Omni*, 484 U.S. at 105, 108 S.Ct. at 410. No federal statute, including the Bankruptcy Code, authorizes service of the present adversary complaint on the Defendants. *See In re Old Electric Inc.*, 142 B.R. 189 (N.D.Ohio 1992) (Bankruptcy Rule 7004(d) not "statute" within meaning of Fed. R.Civ.P. 4(e)). Therefore, this court may only obtain personal jurisdiction over the Defendants if New York's long-arm statute provides that they are amenable to service. *See In re R.M.R. Corp.*, 133 B.R. 759, 761 (Bankr.D.Md.1991); *All American*, 78 B.R. at 357. Accordingly, this court must examine N.Y.Civ.Prac.L. & R. §§ 301 and 302, which provide, in relevant part, as follows:

§ 301. **Jurisdiction over persons, property or status.**

A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore.

§ 302. **Personal jurisdiction by acts of non-domiciliaries.**

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property, within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent court of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y.Civ.Prac.L. & R. §§ 301 & 302 (McKinney 1990).

■ In order for a court to exercise personal jurisdiction over a foreign corporation under section 301, the "doing business" section, the corporation must do business in New York more than occasionally or casually but with a "fair measure of permanence and continuity." *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982). The debtor has not alleged that any one of the Defendants conduct any business, let alone the requisite business, in New York, or the United States for that matter, to subject themselves to personal jurisdiction under section 301. Therefore, this court cannot exercise personal jurisdiction over any of the Defendants under section 301.

Under section 302, a court may exercise personal jurisdiction over the Defendants based on a nexus between the activity and the claim. *Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F.Supp. 669, 675 (S.D.N.Y.1989); *Faherty v. Fender*, 572 F.Supp. 142, 145 (S.D.N.Y.1983) (must engage in purposeful activity within the state and must be "substantial relationship" between activity and cause of action).

The court will first address section 302(a)(1), the "transacting business" provision. In *Faherty*, a Texas resident sought a declaratory judgment that a Texas judgment the defendant had obtained was void and that the defendant had caused the

plaintiff to suffer emotional distress. The defendant moved to dismiss the complaint based on the court's lack of personal jurisdiction. The *Faherty* court held that although the defendant did conduct meetings in New York with the plaintiff, the plaintiff's cause of action arose from conduct which occurred in Texas and not from the defendant's transactions in New York. *Id.* at 146 & n. 3.

In the present case, the only "business transaction" that the debtor's adversary complaint recites out of which either the debtor's second claim for breach of CSM's By-Laws or third claim for tortious interference could have arisen, is the Defendants' participation in the debtor's sale of the CACP Stock in this court. As to the defendant Patagonica, the debtor does not allege in its complaint that Patagonica ever entered this country to bid, nor even submitted a bid in the sale from Argentina. *See Andros Compania*, 714 F.Supp. at 676 (insufficient nexus between the transacting activities and the claim in this lawsuit). Consequently, this court may not exercise personal jurisdiction over Patagonica pursuant to section 302.[10]

Similarly, with regard to the debtor's third cause of action for tortious interference, the only contact that either Perez, Sudacia or Loma Negra have with the forum is in connection with their bidding for the CACP Stock in this court. While the debtor alleges that these parties interfered with a contract, namely CSM's By-Laws, the interference took place in Argentina, the contract was entered into in Argentina, and the debtor is not even a party to CSM's By-Laws; its subsidiary, CACP was the shareholder, which had entered into the Shareholders' Agreement with Patagonica.

More importantly, the Defendants' connection with this forum relates to the debtor's sale of the CACP Stock in this court. The alleged tortious interference relates to other CACP stock, transferred by Patagonica before the bankruptcy sale. The bankruptcy sale was simply a link in a chain of events. *See Xedit Corp. v. Harvel Indus. Corp.*, 456 F.Supp. 725 (S.D.N.Y.1978). Consequently, the court finds that the required nexus between the transaction and the claim insufficient to confer personal jurisdiction over the Defendants pursuant to section 302(a)(1) with regard to the third claim for relief in the complaint.[11]

The court finds section 302(a)(2) inapplicable because this court has already resolved against the debtor in this decision the two causes of action that the debtor brought involving torts committed within the state. The debtor's second and third claims for relief involve torts that occurred outside of the State. The court now turns to section 302(a)(3). In order to establish personal jurisdiction under this section, the plaintiff must demonstrate harm within the State that is "direct, and not remote or consequential." *Porcello v. Brackett*, 85 A.D.2d 917, 446 N.Y.S.2d 780 (4th Dep't. 1981), *aff'd*, 57 N.Y.2d 962, 457 N.Y.S.2d 243, 443 N.E.2d 491 (1982). The New York Court of Appeals has stated:

> It is ... long been held that the residence or domicile of the injured party within a State is not a sufficient predicate for jurisdiction, which must be

---

10. The debtor's allege for the first time in their brief in opposition to the Defendants' motion to dismiss the fact that Perez was acting as Patagonica's agent with regard to agreeing to control the sale. *Debtor's brief*, at 37. The debtor makes no mention of this in its adversary complaint. The court will not consider this contention. *See supra* note 3. However, even if the court were to consider it, the debtor's one-sentence allegation in its brief that Perez was acting as Patagonica's agent does not persuade this court sufficiently to establish a *prima facie* showing of jurisdiction. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

11. The debtor relies upon *Parke–Bernet Galleries, Inc. v. Frankyln*, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). There, the court refused to dismiss a complaint for lack of personal jurisdiction where the plaintiff sought to enforce a non-resident's bid at an auction in the forum. Clearly, in that case, the defendant's transaction, bidding at the auction, had a close nexus with the claim to enforce the bid. That case is distinguishable from the case at bar because the debtor's actions involving collusion at the sale are not viable. The nexus of the only remaining causes of action to the bankruptcy sale in this case is consequential.

based upon a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there....

*Fantis Foods, Inc. v. Standard Importing Co. Inc.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 787, 402 N.E.2d 122, 126 (1980) (citations omitted).

The debtor has failed to establish direct injury to property within New York. The direct injury in the present case is either the breach of CSM's By–Laws or tortious interference with CACP's contract, both of which occurred in South America. The alleged harm to the defendant in the form of a reduction in the value of the debtor's CACP Stock is clearly a consequence of the breach of CSM's By–Laws or tortious interference. The debtor would sustain these injuries regardless of where it does business or is located. The debtor claims to have suffered injuries in New York because it is in bankruptcy, but could just as easily have claimed Connecticut, were it not in bankruptcy, as its headquarters is in that state. *See Faherty*, 572 F.Supp. at 148; *Davidson Extrusions, Inc. v. Touche Ross & Co.*, 131 A.D.2d 421, 516 N.Y.S.2d 230, 233 (2d Dep't 1987). Accordingly, this type of derivative injury is insufficient to bestow personal jurisdiction upon this court pursuant to section 302(a)(3).

 The debtor offers, as another basis by which this court may exercise personal jurisdiction over the Defendants, 28 U.S.C. § 1334(b), which confers on district courts original but not exclusive jurisdiction over all civil matters with a nexus to a bankruptcy case.[12] In support of its position

that section 1334(b) provides this court with the necessary personal jurisdiction, the debtor cites *In re Outlet Dep't Stores, Inc.*, 82 B.R. 694, 698 (Bankr.S.D.N.Y. 1988). There, the court specifically held that section 1334 did not allow the court to exercise personal jurisdiction over out-of-state defendants, but instead, found that Federal Rule of Bankruptcy Procedure 7004(d) was the key provision establishing the court's personal jurisdiction. *Id.* at 697.

*Outlet*, while irrelevant as to the present case, is illustrative of the confusion prevailing between the parties regarding the interplay of personal jurisdiction and subject matter jurisdiction in the bankruptcy courts. It is *Outlet's* focus on 7004(d) rather than 1334(b) that demonstrates that where a federal statute provides for nationwide service of process, the question of whether a domestic corporation, for example, is amenable to service is academic.[13] *Id.* at 697. As this court noted above, the present case does not require the court to apply Rule 7004(d), but rather, Rule 7004(e), the provision governing service on a party in a foreign country. Had Congress wanted to do away with the inquiry as to the amenability of a foreign party to service of process, Congress would have enacted Rule 7004(d) so as to allow worldwide service of process rather than nationwide service of process. Instead, Congress included Rule 7004(e). *See In re Old Electric Inc.*, 142 B.R. 189, 190–91 (Bankr. N.D.Ohio 1992). Consequently, because this case requires application of Rule 7004(e) rather than Rule 7004(d), the court finds the debtor's attempt to vest this court with personal jurisdiction via section 1334(b) unpersuasive.

---

12. *See* Standing Order of Referral of Cases to Bankruptcy Judges, July 10, 1984 (S.D.N.Y., Ward, J.).

13. The debtor also cites this court's decision in *Schack Glass*, 20 B.R. 967 (Bankr.S.D.N.Y.1982), to support its argument that section 1334(b) confers upon this court personal jurisdiction over the Defendants. In *Schack Glass*, this court decided whether or not a debtor's service of process on a defendant in a preference action with an office in the United States was defective under former Bankruptcy Rule 704(c).

The holding in that case is therefore completely consistent with the holding herein because section 1334(b), along with Bankruptcy Rule 7004(d), would give this court personal jurisdiction as the otherwise foreign defendants in *Schack* maintained an office within this country, thereby triggering the "national service of process" provision of Rule 7004(d) rather than the separate "service on others in a foreign country" provision. The debtor, in fact, concedes that sufficiency of process is not the question in this case. *Debtor's Memo,* at 31 n. 13.

890

■ The debtor also asserts that this court may invoke the doctrine of pendent personal jurisdiction in order to exercise personal jurisdiction over the Defendants. While a federal court may exercise pendent subject matter jurisdiction over a claim ordinarily outside the court's subject matter jurisdiction, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), no analogous doctrine of pendent personal jurisdiction exists. *Connors v. Marontha Coal Co., Inc.*, 670 F.Supp. 45, 47–48 (D.D.C.1987). In *Debreceni v. Bru–Jell Leasing Corp.*, 710 F.Supp. 15 (D.Mass.1989), the court dismissed a pendent common law fraud claim for lack of personal jurisdiction and held that a state's long-arm statute was the controlling statute with regard to determining whether a court could exercise personal jurisdiction over a defendant to a pendent common law claim. *Id. See Connors*, 670 F.Supp. at 47–48. Even if the doctrine of pendent personal jurisdiction existed, the *Debreceni* case is in accord with Bankruptcy Rule 7004(e), which this court has held earlier in this opinion requires application of a state's long-arm statute. Consequently, the court will not invoke the theory of pendent personal jurisdiction, if in fact it exists and is applicable in bankruptcy cases, to exercise personal jurisdiction over the Defendants.

Accordingly, the court will dismiss both the second and third claims for relief based upon Federal Rule of Bankruptcy Procedure 7004(e) and 7012. The court therefore need not consider the Defendants' arguments that the complaint should be dismissed because the debtor lacks standing or that the non-bankruptcy claims should be dismissed based on this court's lack of subject matter jurisdiction.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this proceeding under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A) and (*O*).

2. The debtor's cross-motion for summary judgment with regard to its section 363(n) claim is granted in favor of the Defendants and the first claim of the adversary complaint is dismissed.

3. The Defendants' motion to dismiss the debtor's second claim for relief for breach of CSM's By–Laws for lack of personal jurisdiction over Patagonica is granted.

4. The Defendants' motion to dismiss the debtor's third claim for relief for tortious interference with contract for lack of personal jurisdiction over Perez, Sudacia and Loma Negra is granted.

5. The Defendants' motion to dismiss the debtor's fourth claim for fraudulent concealment is granted.

SETTLE ORDER ON NOTICE IN ACCORDANCE WITH THE FOREGOING.