In re NEW YORK TRAP ROCK COR-
PORATION, Lone Star Industries,
Inc., et al., Debtors.

LONE STAR INDUSTRIES, INC., a Dela-
ware corporation, Debtor and Debtor-in-
Possession, Plaintiff–Appellant,

v.

COMPANIA NAVIERA PEREZ COM-
PANC, Sacfimfa, Sudacia, SA, Invesora
Patagonica, SA and Lomo Negra Com-
pania Industrial Argentina SA, all Ar-
gentine corporations, Defendants–Appel-
lees.

Nos. 90 B 27276 to 90 B 21286,
90 B 21334 and 90 B 21335.
Adv. No. 92–5403A.
No. 93 Civ. 5480 (VLB).

United States District Court,
S.D. New York.

Nov. 16, 1993.

Steven M. Kayman, Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiff-appellant.

Howard, Darby & Levin, New York City, for defendant Perez Companc.

Curtis, Mallet Prevost, Colt & Mosle, New York City, for defendant-appellee Lomo Negra.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

I

This bankruptcy appeal involves sale of the debtor Lone Star's 50% interest in a series of Argentine corporations. The holder of the other 50% interest, the defendant Perez Companc, sold its share to a potential buyer at a higher price than obtained by Lone Star, to the only other interested bidder for shares in the Argentine entities.[1] Prior to this sale, Perez Companc held an advantage in bidding for Lone Star's share because as the existing 50% owner, only it could deliver 100% of the shares involved to a third party. Only Perez Companc could offer complete control of the Argentine companies to a new owner.

Lone Star, on the other hand, chose to take advantage of its ability to file for a

---

1. Perez Companc, sold its 50% of the Argentine entities, to a third party for $55 million without informing Lone Star. Lone Star later sold its 50% interest to the same party for $37 million; Perez Companc did not bid and there were no other bidders. For a more detailed discussion of the facts, see *In re New York Trap Rock Corp. (Lone Star Industries v. Compania Naviera Perez Companc et al.)*, 155 B.R. 871 (1993) (Schwartzberg, J.).

noninsolvency bankruptcy for purposes of effecting a corporate reorganization under Chapter 11 of the United States Bankruptcy Code, and pursuant to that Chapter sought to liquidate its 50% interests in the Argentine entities. Because a 50% share of what amounts to a corporate partnership with parties with whom one has no prior dealings is difficult to sell, Lone Star found Perez the only available buyer—for the very reason that only it could obtain for itself or a third party complete ownership of the Argentine entities. Lone Star, of course, knowingly entered into the corporate betrothals involved which would doubtless be profitable if and only if both 50% owners cooperated, and which would foreseeably be difficult to sell successfully to others at a desirable price.

As is often the case in bargaining, a party which must complete a transaction is in a weaker position than one which can walk away from it. See Roth, "Toward a Theory of Bargaining: An Experimental Study in Economics," 220 Science 687 (May 13, 1983); Hofstadter, "Mathematical Themas," 245 Sci Am 18 (July 1981). Where a party is irrevocably committed to sell an asset and bail out of a relationship, the opportunities for win-win bargaining in a nonzero sum game which are available in ongoing relationships are thinned to a point approaching nonexistence. Compare T. Schelling, *The Strategy of Conflict* (1960) with E. Goffman, *Strategic Interaction* (1969).

Lone Star, having chosen to enter a 50%–50% corporate shareholder relationship and further to commit itself to sell its holdings within a finite time, was quite predictably able to obtain only a fire sale price for its share in the Argentine entities. Dissatisfied, it brought this litigation asserting that Perez Companc should have acted in such a way as to equalize the inherently unequal structure of the situation.

## II

In its adversary complaint before the Bankruptcy Court, Lone Star contends that Perez Companc's conduct and related acts of other defendants violated 11 U.S.C. § 363(n) which provides for adverse consequences when "the sale price [of an asset sold in bankruptcy] was controlled by an agreement among potential bidders at such sale." Lone Star also asserted a large number of related state law claims.

United States Bankruptcy Judge Howard Schwartzberg in a carefully reasoned 41-page opinion reported at 155 B.R. 871 (1993) held that it was impossible for a sale of property *other than that belonging to the debtor* to violate § 363(n); the seller of non-debtor property was acting independently and any consequences to the debtor were not regulated by the statute. He also rejected Lone Star's nonfederal claims. I affirm the decision of the Bankruptcy Court for the reasons set forth by Judge Schwartzberg in his opinion, and for additional reasons set forth in greater detail below. I do not repeat here the reasoning articulated by the Bankruptcy Judge, with which I agree,[2] and discuss only my additional reasons for reaching the same conclusions as did the Bankruptcy Judge:

■ (1) Failure to obtain a corporate control premium does not represent a judicially cognizable loss of a property right absent special circumstances such as violation of the Williams Act, designed to protect public shareholders against potential pressure in connection with tender offers for traded securities.

■ (2) Section 363(n) of the Bankruptcy Code, in addition to not covering sales of non-debtor property as pointed out by Judge Schwartzberg, bars only collusion among actual or potential bidders for a debtor's property and not secret or other use of one's own bargaining power.

■ Exercise of supplemental jurisdiction over the remaining, nonfederal, claims in this

---

**2.** Appellant points out that a transaction not involving a debtor may violate 11 U.S.C. § 363(n) if it is a ruse or subterfuge to prevent someone from bidding, but this concept is inapplicable to the present case. Appellant also stresses that it never waived the right to discovery. But no

specific discoverable information which would alter Judge Schwartzberg's ruling or those in this memorandum order has, however, been pinpointed. I find these and numerous other objections made to Judge Schwartzberg's decision lacking in merit.

case was properly declined, in addition to the reasons given by Judge Schwartzberg, because of inappropriateness of such exercise under the criteria set forth in 28 U.S.C. § 1367(c).

### III

■ The essence of Lone Star's complaint is that the "control premium" inherent in ability to determine the policies of a corporation is an asset belonging in part to Lone Star, so that any machinations to deprive Lone Star of its share of that premium are illegal under one or more sources of law.

■ The existence of a control premium is based on the ability of the controlling party to utilize the assets of the controlled corporation for the benefit of the controlling party rather than exclusively for the benefit of all stockholders equally. In some instances, a side benefit to the controlling party and benefit to the shareholders collectively are sufficiently aligned that both gain from the coincidence of interests. Thus, corporate law does not forbid all self-interested transactions involving officers or directors of an entity, but requires full disclosure of them to independent directors and frequently bars voting on such transactions by the interested parties.

■ Where coincidence of interests is attenuated and a transaction benefitting those in control of an entity does *not* redound to the benefit of all, there is a breach of the fiduciary duty of the directors of the entity chosen by the controlling party. The combination of legitimate coincident interests and temptations of breaches of fiduciary duty by directors or management at the behest of holders of control, yields a control premium as a result of buyers' and sellers' evaluation of how much a position in a corporation is worth. See *City National Bank v. American Commonwealth Financial Corp.*, 801 F.2d 714, 715 n. 1 (4th Cir.1986), *cert. denied* 479 U.S. 1091, 107 S.Ct. 1301, 94 L.Ed.2d 157 (1987); Bayne, "A Legitimate Transfer of Control," 18 Stan L Rev 438 (Jan 1966); Berle, "The Price of Power: Sale of Corporate Control," 50 Cornell LQ 628 (1965); Bayne, "The Sale of Corporate Control," 33 Fordham L Rev 583 (1965); Comment, 31 Emory LJ No 1 at 139 (Winter 1982); see also Note, 27 Geo LJ 217 (1938).

Trading in corporate control has at times functioned to the detriment of noncontrolling shareholders (generally holding far less than 50% interests in the entity involved), leading Congress to adopt restrictions on the practice in connection with tender offers for publicly held corporations in the United States. These restrictions involved waiting periods for mature consideration of such offers and mandatory proration of tender offers among public shareholders whether or not they rushed to buy first before the offeror had the necessary number of shares to seize control. See § 14(d)(6) of the Williams Act, 15 U.S.C. § 78n(d)(6); Securities & Exchange Commission Rules 14–d–8, 17 CFR 240.14d–8 and 14–d–6(e)(vi), 17 CFR 240.14(e)(vi); *Piper v. Chris–Craft Industries*, 430 U.S. 1, 23, 97 S.Ct. 926, 940, 51 L.Ed.2d 124 (1977); *Pryor v. United States Steel Corp,* 794 F.2d 52, 55–56 (2d Cir.1986).

■ No such statutory restriction on purchases and sales of securities involving corporate control has been enacted with regard to privately held companies not traded on United States exchanges. Apart from such special cases, a control premium—as opposed to any market or agreed value of the shares themselves—is not ordinarily recognized as an independent legally protected property interest.

■ Absent specific statutory protection such as that provided by the Williams Act, a corporate control premium is not a benefit to which the holder is entitled to rely absent violation of contractual commitments, fraud, breach of trust or other legally prohibited behavior. As discussed below, such claims in this case, if sustainable, are based on state or foreign, not federal law, and it is questionable whether this country is the proper location for their exploration.

Acknowledgement of the monetary value of a share of control, in contrast to a share of the profits of an enterprise, as a separate, independent property right to be protected by the courts would require the judiciary to determine just how far directors could practi-

cably go in violation of their fiduciary duty to proceed exclusively for the benefit of all shareholders. This is not a tenable position for the courts.

Awarding half of the difference between the proceeds obtained by the debtor and that obtained by Perez Companc is not a satisfactory substitute because this would deprive Perez Companc of the value of its contribution toward successful sale of the asset through its willingness to dispose of its own share, thus giving the ultimate buyer ability to manage the Argentine entities without the need for constant consultation and perhaps combat with a co-equal 50% owner. The risk of a disadvantage of this type was inherent in Lone Star's decision to enter into a 50–50 share division in the first instance, and the cost of that choice cannot be shifted to others because it turned out to be significant.

### IV

■ Section 363(n) of the Bankruptcy Code imposes sanctions against action such that in connection with a sale of debtors' property under the Code, "the sale price was controlled by an agreement among potential bidders at such sale". There is no claim here that bidders or potential bidders agreed in advance concerning what sums they would or would not offer at the sale of Lone Star's 50% interest in the Argentine entities involved in this case.

■ In prohibiting collusion affecting bids for property sold under the Bankruptcy Code, § 363(n) is in effect a supplementary antitrust law akin to § 1 of the Sherman Act (15 U.S.C. § 1) with its own separate jurisdictional groundwork and separate sanctions for violation. Section 363(n) does not prohibit independent trading affecting such a price, nor secrecy in regard to such trading. In this regard, § 363(n) parallels the interpretation given to the Sherman Act—and by virtue of its importance to the related Robinson–Patman Price Discrimination Act (15 U.S.C. § 13) which encourages rather than prohibits nonfraudulent secrecy in formulation of trading positions. See *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Great*

*Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979).

Lone Star's complaint appears to be not that Perez Companc colluded with another bidder, but that it *failed* to combine forces with Lone Star to permit Lone Star to get a share of the control premium which it had inherently lost the ability to obtain because of its conduct of the equivalent of a fire sale of a 50% interest in the Argentine entities. Collusion between Lone Star and Perez Companc as to what they would demand from third parties for their respective 50% interests in the Argentine entities involved, however (as opposed to a sale of the interest of one to the other) would appear to restrain the market in such shares to the same extent as collusion between Perez and other potential bidders in fixing the price such bidders would offer (which is not claimed to have occurred).

### V

■ In addition to Judge Schwartzberg's reasons for rejecting Lone Star's nonfederal claims, his decision should also be affirmed on the ground that exercise of supplemental (previously known as pendent) jurisdiction over them should be declined under criteria set forth in 28 U.S.C. § 1367(c) once the claim under 11 U.S.C. § 363(n) has been dismissed.

The only significant connection between the Argentine entities and the United States appears to be that a U.S. entity, Lone Star, purchased a 50% interest in them and then sought to reorganize in this country under Chapter 11 of the Bankruptcy Code; all further events in this country were brought about by Lone Star's actions or responses to them. See generally Karmel, "The Second Circuit's Role in Expanding the SEC's Jurisdiction Abroad," 65 St. John's L Rev No 3 at 743 (Summer 1991); Tepass, "Resolving Extraterritoriality Conflicts in Antitrust," 5 Conn J Int'l L No 2 at 565 (Spring 1990); see also *Alesayi Beverage Corp v. Canada Dry Corp*, 797 F.Supp. 320 (SDNY 1992).

Here, the only federal claim in this case (under 11 U.S.C. § 363(n)) has been dismissed. 28 U.S.C. § 1367(c)(3). The intricacies of nonfederal (state or Argentine) corpo-

rate law involved in the remaining claims are novel and complex, and substantially predominate. 28 U.S.C. § 1367(c)(1), (2).

 There are also "exceptional circumstances" involving "other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). Argentina is the primary location of the underlying assets relevant to the sale. The relevance of this factor is emphasized by its treatment as significant in each situation described in each major subdivision of the general federal venue statute. 28 U.S.C. § 1391(a)(2), (b)(2), (e)(2). This factor is as important in adversary proceedings under the Bankruptcy Code as in other contexts. See *In re New York Trap Rock Corp (Lone Star Industries v. Rankin County)*, 158 BR 574 (SDNY 1993).

Argentine corporate law may also be the most appropriate one to govern the rights of the parties with regard to their shares in the Argentine entities at stake in this case. It would be far more appropriate for such matters, in contrast to claims under U.S. Bankruptcy Code provisions such as 11 U.S.C. § 363(n), to be adjudicated in Argentina.

Declination of exercise of supplemental jurisdiction over nonfederal claims where there is no independent basis of federal subject matter jurisdiction is, of course, a lesser step than dismissal on grounds of *forum non conveniens* where such a independent ground is present.

Even if some other source of jurisdiction over nonfederal claims such as diversity of citizenship under 28 U.S.C. § 1332(a)(2) were to be sustainable, the factors discussed above, and by Judge Schwartzberg in regard to personal jurisdiction over the defendants, would support a *forum non conveniens* dismissal with respect to Lone Star's claims. The center of gravity of this case, apart from the bankruptcy sale governed by 11 U.S.C. § 363(n), is clearly in Argentina. See generally *Borden, Inc. v. Meiji Milk Products Co*, 919 F.2d 822 (2d Cir.1990), *cert. denied* — U.S. ——, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991); *Pedro*

*Pablo Blanco F. v. Banco Industrial de Venezuela, SA,* 997 F.2d 974 (2d Cir.1993).