**In re LEVANT LINE, S.A., Debtor.**

**LEVANT LINE, S.A., Plaintiff,**

**v.**

**MARINE ENTERPRISES CORPORATION and Bank of Crete, Defendants.**

**Bankruptcy No. 92 B 44292 (TLB). Adv. No. 92–9901A.**

United States Bankruptcy Court, S.D. New York.

April 21, 1994.

Coritsidis & Lambros by Michael N. Coritsidis, New York City, for debtor/plaintiff.

Varet Marcus & Fink P.C. by Leo G. Kailas, New York City, for defendants.

*AMENDED DECISION*

TINA L. BROZMAN, Bankruptcy Judge.

## OPINION ON MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

At issue is whether a Liberian corporation, which is both a chapter 11 debtor and the

indirect owner of a majority interest in a Greek limited partnership, may vest this court with personal jurisdiction over the limited partnership on the theory that the partnership is a mere department of the debtor. Levant Line S.A. ("Levant"), the debtor, commenced an adversary proceeding seeking to compel the defendants, Marine Enterprises Co., Ltd. ("MEC"), the Greek limited partnership, and the Bank of Crete (the "Bank"), to turn over $1.46 million which Levant claims is property of its estate and is being held by the Bank. Not long afterwards, Chief Judge Lifland, in my absence, signed an order enjoining the Bank from releasing $1.4 million of the funds pending the resolution of the adversary proceeding. After both defendants defaulted, Levant served them with a motion for a default judgment. MEC submitted opposition to the motion and also moved to dismiss the complaint for lack of personal jurisdiction or, alternatively, under the doctrine of forum non conveniens. I adjourned the hearing on the motions to dismiss and for entry of default to allow the parties to take additional discovery in contemplation of an evidentiary hearing solely on the issue of jurisdiction.[1] With discovery completed, I conducted an evidentiary hearing limited to the jurisdictional challenge.

## BACKGROUND

### A. The Dispute Generally

Levant, which is headquartered in New York City, at one time owned and operated three vessels directly or indirectly through affiliates. These vessels primarily transported military equipment from the United States to Black Sea and Eastern Mediterranean ports. Levant's most significant customer was the Greek armed forces. A dispute respecting the trans-Atlantic shipment of particular military cargo for the Greek armed forces precipitated the filing of this adversary proceeding.

In June 1992, all three of Levant's vessels were seized in Greece by a creditor that held a first mortgage on the ships. The following month, in order to avoid a default under an existing contract, Levant entered into an agreement with MEC, Levant's agent in Greece, to perform Levant's obligation pursuant to the so-called Greek Military Contract to transport the military's cargo to Greece for $1.46 million (the "disputed transaction"). MEC, following up on an arrangement initiated by another affiliate of Levant, then entered into an agreement with an Israeli shipping concern to carry the cargo from Wilmington, Delaware to Greece for $1.06 million. The Greek armed forces tendered the $1.46 million to a MEC account at the Bank. The disposition of the balance of the contract price, $400,000, is at the heart of the adversary proceeding. MEC has offered to pay Levant what is essentially a commission of $50,000, a sum far too paltry in Levant's estimation. It is not entirely clear what sum Levant is seeking; its complaint pleads that Levant is entitled to the entire $1.46 million. How this could be so is a mystery. In any event, and notwithstanding Judge Lifland's injunction, it appears that MEC has paid the Israeli shipper and has made other disbursements as well from the $400,000 balance.

### B. The Relationship of the Various Organizations

One might have thought that this dispute would have been resolved without the requirement of judicial intervention given the relationship between Levant and MEC. Levant owns 51% of the shares of a New York corporation, Constellation Navigation, Inc. ("Constellation"), which in turn has a 52% partnership interest in MEC. Levant acquired its 51% interest in Constellation (which at the time already owned its interest in MEC) from an organization called Pharos Lines, an entity affiliated with Levant and which preceded Levant in performing the Greek Military Contract.[2]

---

1. Counsel for MEC has consented to my entering a final order in this matter in the event that I were to determine that MEC's motion were not core. *See* Tr. of October 19, 1993 hearing at 7.

2. To be technical about it, Pharos Lines is still the contracting party with the Greek armed forces. Levant was added as a co-party when the owners of Pharos Lines ceased its operations.

Levant's shares are owned by corporations controlled by the following individuals: Mr. Skoufalos, the president of Levant; Mr. Mamoulakis, the secretary of (and lawyer for) Levant; and Messrs. Valiotis, Bekas, Demetrios, and Xenopoulos. *See* Debtor's Exhibit 1. Until recently, all six of these individuals sat on the board of directors of Levant. For the sake of completeness, it bears mentioning that Skoufalos and Mamoulakis, the latter who signed Levant's chapter 11 petition as its corporate secretary, were principals of and held the same titles at Pharos Lines as they did at Levant until Pharos Lines ceased operations in 1991. The duo created Levant and brought in Valiotis, Bekas, Demetrios and Xenopoulos, none of whom had any experience in the shipping industry, as investors to capitalize the venture.[3] Mamoulakis testified that after he was booted from Levant's board, he and Skoufalos started a new venture. They are now principals of Stellar Maritime, Inc. and Stellar Freight, Ltd. (collectively referred to as "Stellar"), two organizations that successfully bid against Levant during Levant's chapter 11 case in the most recent bidding for the Greek Military Contract. Thus, the Greek Military Contract has travelled along with Mamoulakis and Skoufalos from Pharos Lines to Levant and then to Stellar.[4]

As for Constellation, the remaining shares are owned by Messrs. Kulukundis, Christophides, and Chiaputa. The board of directors of Constellation was composed of the three shareholders as well as Skoufalos, Valiotis and Xenopoulos, who were elected to the board in 1990.[5] MEC's remaining partnership interests are owned by: Ms. Aphrodite Methenitou (who owns 6%), and Messrs. Zoidis, Nicolaou, Sceverides, Georgiou, and Kontoleon. It does not appear as though anyone other than the shareholders and their proxies are directors of MEC.

Levant is registered in Greece as a "law 89 corporation" which, without the guidance of any competent evidence on Greek Law, I understand to be a foreign-owned company permitted to maintain a corporate presence there so long as the business in which it engages is not in Greece. If the law 89 corporation confines itself to foreign business, its revenues will not be taxed in Greece. The parties refer to Levant's office in Greece as Levant 89, although it appears that the entity is Levant itself, rather than a separate entity. (Not having the benefit of competent evidence of Greek law, however, I make no finding in this regard.) *See* Debtor's Exh. 1 (in which certain minutes of Levant board meetings refer to the entity as "the Company's office in Greece."). Zoidis, a Greek resident, was the general manager of Levant 89[6], which maintained its own bank account at Banque Franco–Hellenic. *Id.* Levant 89 employed a handful of people.

## C. The Agency Agreement

According to MEC, it and Levant are parties to an April 1990 agency agreement in which MEC agreed to act as Levant's exclusive representative in Greece. *See* Plaintiff's Exhibit B. In that agreement, which MEC says was signed by the parties in Greece, MEC agreed to perform "all of the customary services of a traffic representative ... in respect to [Levant's] Trans–Atlantic berth service between United States ports, Mediterranean and other ports." *Id.* at ¶ "FIRST." Under this arrangement, MEC was not permitted to provide similar services

---

**3.** Although significant investments were made by Valiotis, Bekas, and Xenopoulos (and I would venture to guess Demetrios as well), it is not clear whether Mamoulakis and Skoufalos paid anything for their Levant shares or whether they had promoted interests. Mamoulakis admitted to not paying anything for his original shares; beyond that, the record is unrevealing.

**4.** I would not have been surprised to see Mamoulakis and Skoufalos named as defendants in an adversary proceeding commenced by Levant given their presence in New York and their activities vis-à-vis Levant. It appears, however, that Levant has chosen, instead, to sue what it characterizes as its renegade partially-owned affiliate.

**5.** Mamoulakis testified that Constellation's board was increased by four from the original three shareholders. Skoufalos, Valiotis and Bekas are three of the four; I can not say for certain whom the fourth is.

**6.** Mamoulakis testified that Zoidis, in his capacity as manager of Levant 89, was the individual who was designated to accept service of process and attend to tax matters.

to competitors of Levant without obtaining Levant's prior approval. *Id.* at ¶ "SEVENTEENTH." The contract provided that MEC would "deposit all monies collected on behalf of [Levant] in a First Class Bank ..." and use these funds to make any necessary disbursements for Levant's account. *Id.* at ¶ "ELEVENTH." [7] The agreement called for MEC to provide an accounting, supported by proper vouchers, in a form directed by Levant. *Id.* The parties also agreed that any dispute would be resolved in a Greek forum in accordance with Greek law. Id. at ¶ "FOURTEENTH" Levant suggests, but its principals do not unequivocally swear, that this entire agency agreement is a recent fabrication. I find nothing in the record to support Levant's charge. It was signed by Skoufalos, on behalf of Levant, and Methenitou, on behalf of MEC, both with corporate authority.[8]

*D. The Witnesses*

Were one to start reading a transcript of this proceeding at the beginning and stop at any point before the end, it would be very difficult to piece together a credible account of what actually transpired here. Prior to the testimony of Mamoulakis, the defendant's last witness, the other witnesses had painted two vastly different and seemingly irreconcilable pictures. This, I realize now, results from the fact that none of the Levant shareholders were actually in the know. When they were pushed to go beyond their broad brush testimony, the vast gaps in their knowledge were exposed. As for Aphrodite Methenitou, the current managing director of MEC, she was knowledgeable, yet less forthcoming than she might have been. The door to the truth was unlocked not through the incessant volleys over whether the president of Levant had a key to MEC's offices (an unimportant question whose answer remains obscure), but rather through the testimony of John Mamoulakis.

*E. The Story Behind the Suit*

In a most remarkable cross-examination, the story of Levant, its predecessor and, quite possibly, its successor finally was unfurled. As previously mentioned, the right to carry out the Greek Military Contract is central to this dispute. Mamoulakis, a New York maritime lawyer who has represented Levant while he was its secretary and a director, established that this contract was quite valuable. That is why, when Pharos Lines was experiencing financial difficulties, Skoufalos and Mamoulakis found new investors, created Levant, and, in substance, transferred the Greek Military Contract from Pharos Lines to Levant. MEC, which had had a similar relationship with Pharos Lines, continued its role, albeit for a different principal.

This all worked until Levant's ships were seized in Greece. Not long after this occurrence, MEC's general manager, who was also on the payroll of Constellation, resigned—apparently as a result of mounting fears of personal financial liability. It was at this juncture that Levant both was planning to file its bankruptcy petition and was attempting to find an alternate method to satisfy an obligation to transport one shipment for the Greek military. Had Levant failed in this latter mission, a substantial bond, which had been posted by Levant and Pharos Lines, would have been forfeited. In addition, the principals feared that default on the contract would have irreparably affected their reputation with the Greek government and the prospect for any future business.

Accordingly, on the eve of filing the petition, David Alouf, an executive vice president of Constellation, which had its office in New York, called Sam Niego, a fellow Israeli who was a principal or officer of the third party shipper, and engaged a ship to carry the one load of military cargo. It was through the significant efforts of Alouf, who assured Nie-

---

7. Pursuant to this provision, MEC asserts it made disbursements for Levant's account out of the $400,000 proceeds from the disputed transaction.

8. As discussed later, *see* footnote 9, there is a dispute regarding the manner in which Metheni-

tou obtained her corporate authority. Nonetheless, there is nothing which suggests that the agency agreement is a fabrication. Based on this record, it would appear, at worst, that MEC's representative was unauthorized to bind MEC.

go of the certainty of payment, that Niego agreed to transport the cargo. To protect his organization, however, Niego and Alouf agreed that a booking note would be signed by MEC, which was the entity authorized to collect the proceeds (to be paid in Greek Drachmas) of the Greek Military Contract. Although Alouf induced Niego to enter into the transaction, the final terms were negotiated by Methenitou in Greece. In furtherance of this arrangement, Levant, through Skoufalos, signed with MEC a liner booking note executed in Piraeus, Greece. Ms. Methenitou, as general manager of Mec,[9] thereafter signed the booking note with the third party shipper on behalf of MEC.

### F. Events Related To The Chapter 11 Case

Remember that all this was going on as Mamoulakis was preparing with bankruptcy counsel the chapter 11 petition which Mamoulakis executed on July 24, 1992. As Mamoulakis tells it, one (or more) Levant board of directors meeting(s) was (or were) convened prior to the filing of the petition at which all of the directors of Levant voted in favor not only of the filing of the bankruptcy petition but also of the assignment of the rights and the delegation of the duties to MEC under the Greek Military Contract. Indeed, no evidence contradicts this assertion. However, as indicated earlier in this decision, Mamoulakis and Skoufalos once again have secured the Greek Military Contract, this time, through Stellar, to whom Methenitou is a paid consultant.

### G. The Impetus for the Suit

The frustration of the Levant shareholders derives from their perception that Skoufalos and Mamoulakis pulled a fast one on them. Levant's shareholders claim that the $50,000 which Levant was promised for transferring its opportunity to MEC is too low.[10] The $350,000 transferred to MEC, they insist, is not appropriate in light of the facts that the transportation was arranged by Alouf for the benefit of Levant and that the surety bond was the property of Levant. Thus, they assert, the reward received by MEC far exceeded the risk taken and Levant was left with nothing.

I am not wholly persuaded by Levant's shareholders' testimony that Skoufalos and Mamoulakis withheld critical information from them. Rather, the shareholders may not have comprehended the import of what they were told. Be that as it may, there is no question that these shareholders were at times called upon to wire substantial sums of money to Greece to fund MEC's operating deficits. It also has been established that MEC was being subsidized directly by Levant. Similarly, the record remains unrefuted that while these shareholders were voted a seat on the Constellation board of directors, Skoufalos and Mamoulakis simultaneously were "relieving" the board of the "headache" of managing the enterprise. They did this by creating an "executive committee" for Constellation consisting of Skoufalos and Chiaputa, which committee was vested with the authority to make decisions when the board was not in session. It was the executive committee which gave Methenitou a power of attorney to vote the Constellation shares which she used to assure herself of her election as general manager and to authorize the signing of the booking note.

### H. The Adversary Proceeding and MEC's Jurisdictional Challenge

With these facts as a backdrop, an adversary proceeding was commenced naming MEC and the Bank. I have been called upon to determine whether MEC properly can be haled into the Southern District of New York. MEC asserts in its motion to dismiss that MEC lacks any significant contacts with New York and that the transaction arose and took place in Greece. Accordingly, MEC concludes, there is no basis for personal jur-

---

9. An emergency MEC board meeting was convened at which each of the MEC shareholders, either in person or in proxy, unanimously voted to elect Methenitou as the new general manager to replace her retiring predecessor. There is a dispute, not germane to the resolution of this motion, over the propriety of her election and over her then newly-attained status as attorney-in-fact for Constellation.

10. Methenitou testified that the $50,000 was used, without an order of this court, to pay debts owed by Levant to Greek customs agents.

isdiction. When one strips away the rhetoric, Levant's response is that MEC, as Levant's agent, was acting as a mere department of Levant and, thus, since jurisdiction exists over the parent/principal Levant, it must exist over the agent/department MEC.

Jurisdiction is an issue here because MEC, a Greek limited partnership formed in or about 1985, has its only office in Piraeus, Greece. MEC is not authorized to do, nor does it solicit or conduct, business in New York or any other place in the United States. MEC does not own real estate in New York, have a telephone listing in New York or have agents in the United States who solicit or conduct business on behalf of MEC. None of MEC's employees visits the United States with any frequency. The record establishes that only two employees ever were in New York, and they were here in furtherance of MEC's business as Levant's agent. Between 1990 and 1992, Methenitou traveled to New York on three or four occasions, twice for seminars on bar coding and the other times on matters related to the Greek Military Contract. Zoidis, the chief engineer of MEC, accompanied the Levant ships to New York or passed through New York, also about four times, in order to supervise necessary repairs to the ships or to evaluate ships that Levant was considering purchasing.

Counsel for Levant asks me to find that Levant, Constellation and MEC were operated interchangeably and in essence are one single entity. It is not disputed that Levant or others with whom it has a relationship were MEC's largest source of income.[11] Similarly, Levant and MEC leased contiguous connected office space in Greece. At that location, they shared a fax machine, a telex number and at least one telephone number.

The evidence establishes that Levant's management had a great deal of input in and influence over the operational decisions that were made at MEC on behalf of Levant. Methenitou conceded that budgets were sent first to Pharos Lines and, after its demise, to Levant for all of the expenses incurred by these two organizations in Greece for vessels, office and employee expenses. This is fully consonant, however, with MEC's role as Levant's agent. The record is unrefuted that MEC regularly convened meetings of its board of directors, kept separate books of account and maintained its own bank account to which no Levant officer or employee had signatory authority. The evidence is less clear as to personnel decisions and strategic planning decisions, both of which were bound up to some extent with Levant given Levant's status as MEC's primary customer.

## DISCUSSION

■■■ MEC's motion to dismiss is bottomed on Federal Rule of Civil Procedure 12(b)(2), made applicable here by Federal Rule of Bankruptcy Procedure 7012(a). The showing a plaintiff need make to evade dismissal on Rule 12(b)(2) grounds heightens as the court becomes more acquainted with the factual surrounding of the matter before it. Thus, when the court is asked to rule on a Rule 12(b)(2) motion at the case's inception, before evidence is adduced, the plaintiff need only establish, though recourse to its pleadings, affidavits and supporting materials, a *prima facie* showing of jurisdiction. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990), *cert. denied* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *CutCo Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984). However, as here, after the parties have taken discovery and the court has conducted an evidentiary hearing on the motion, the plaintiff must establish jurisdiction by a preponderance of the evidence. *A.I. Trade Finance, Inc. v. Petra Bank,* 989 F.2d 76, 80 (2d Cir.1993); *Ball,* 902 F.2d at 197; *Cutco,* 806 F.2d at 365; *Beech,* 751 F.2d at 120.

Both parties assume that New York's Civil Practice Law and Rules governing personal

---

**11.** Whether or not Levant was MEC's only source of income is disputed. In addition to its role as Levant's exclusive agent in Greece, MEC received income for providing "husbanding" services to a handful of ships other than those owned by Levant. Although Levant claims that these management agreements were with shipowners who were affiliated with Levant, beyond certain bald assertions, there is nothing to support this conclusion.

jurisdiction control the resolution of this dispute and that the outcome turns on whether MEC has sufficient contacts with the State of New York. This analysis is not entirely accurate. The parties' confusion arises from a failure to recognize that as a bankruptcy judge, I sit under a grant of federal question jurisdiction given me under 28 U.S.C. § 1334.

In cases involving a federal question, a court will not invoke the traditional minimum contacts test if "a federal statute specifically authorizes service of process on a party not an inhabitant of or found within the forum state." *Kinetic Instruments, Inc. v. Lares,* 802 F.Supp. 976, 981 (S.D.N.Y.1992); *In re New York Trap Rock Corp.,* 155 B.R. 871, 885 (Bankr.S.D.N.Y.), *aff'd,* 160 B.R. 876 (S.D.N.Y.1993); *In re Ace Pecan Co., Inc.,* 143 B.R. 696, 698 (Bankr.N.D.Ill 1992) (citations omitted); cf. *In re Outlet Dept. Stores, Inc.,* 82 B.R. 694, 699 (Bankr.S.D.N.Y.1988) ("in federal-question cases, where nationwide service of process is permitted, 'the minimum contacts' test set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) does not apply.") The Supreme Court has made it clear that the proper analysis focuses first on a party's amenability to service, i.e. "whether the procedural requirement of service of the summons has been satisfied." *Trap Rock,* 155 B.R. at 885 (citing *Omni Capital International v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987)). As the High Court noted in *Omni:*

> "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444–445 [66 S.Ct. 242, 246, 90 L.Ed. 185] (1946). Thus, before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be

authorization for service of summons on the defendant.

484 U.S. at 104, 108 S.Ct. at 409.

In connection with an adversary proceeding pending in a bankruptcy court, Federal Rule of Bankruptcy Procedure 7004(d) and (e) govern service of process. Rule 7004(d) governs service in the United States and accordingly is inapplicable here; Rule 7004(e) governs service of process in a foreign country. *Trap Rock,* 155 B.R. at 885; *Ace Pecan,* 143 B.R. at 699. This rule, titled "Service on Debtor and Others in Foreign Country" provides:

> The summons and complaint and all other process except a subpoena may be served as provided in Rule 4(d)(1) and (d)(3) F.R.C.P. in a foreign country (A) on the debtor, any person required to perform the duties of a debtor, any general partner of a partnership debtor, or any attorney who is a party to a transaction subject to examination under Rule 2017; or (B) on any party to an adversary proceeding to determine or protect rights in property in custody of the court; or (C) on any person whenever such service is authorized by a federal or state law referred to in Rule 4(c)(2)(C)(i) or (e) F.R.Civ.P.

Here, subsection (A) is inapplicable as MEC is a non-debtor being served in a foreign country. *Trap Rock,* 155 B.R. at 886; *Ace Pecan,* 143 B.R. at 698. Subsection (B) is also inapplicable, because the property in custody contemplated by that subsection is the type of tangible property in the custody of the court which gives rise to jurisdiction *in rem* to determine even a foreign defendant's rights in such property. *Trap Rock,* 155 B.R. at 886; *Ace Pecan,* 143 B.R. at 698; *In re All American of Ashburn, Inc.,* 78 B.R. 355, 356–57 (Bankr.N.D.Ga.1987). Subsection (C), the remaining provision available for service in a foreign country, directs the court to look to Federal Rule of Civil Procedure 4 and particularly, for purposes here, to subsection 4(e).

Rule 4(e) *normally* requires the federal court to look either to a federal statute or to the long-arm statute of the state in which it sits to determine whether a defendant is amenable to service. *Omni,* 484 U.S. at 105,

108 S.Ct. at 410. As the Supreme Court noted in *Omni*, "[t]his assumes, of course that the defendant is not 'an inhabitant of or found within the state,' Fed Rule Civ.Proc. 4(e), and has not consented to service." *Id.* at 105 n. 9, 108 S.Ct. at 410 n. 9.[12] Up until December 31, 1993,[13] with certain exceptions not here relevant, no federal statute, including the Bankruptcy Code and its Rules, authorized service of an adversary complaint on foreign defendants.[14] *Trap Rock*, 155 B.R. at 887; *Ace Pecan*, 143 B.R. at 696; *In re Old Electric Inc.*, 142 B.R. 189, 191 (Bankr. N.D.Ohio 1992). Levant does not argue that MEC has either expressly or impliedly consented to service. Thus, personal jurisdiction over MEC will exist if either CPLR §§ 301 or 302 permit.

*"Doing Business" under CPLR § 301*

■ Under CPLR § 301, a court may exercise jurisdiction over a defendant corporation in any action if that corporation is "doing business" in New York. To satisfy the doing business test, a corporation must be operating within New York with a fair measure of permanence and continuity. *Schenck v. Walt Disney Co.*, 742 F.Supp. 838, 840 (S.D.N.Y. 1990); *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917). Occasional or casual business in New York is not enough; the corporation must be engaged in such a continuous and systematic course of business here that the court can find it is present here *Ball*, 902 F.2d at 198.

■ In determining whether a foreign corporation is doing business within New York, New York courts employ a "pragmatic test" and look to the existence of bank accounts, employees, ownership of leases on real property, public relations and publicity work and sales within the state. *Vendetti v. Fiat Auto, S.P.A.*, 802 F.Supp. 886, 890 (W.D.N.Y.1992); *Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 260 N.Y.S.2d 625, 629, 208 N.E.2d 439 (1965). Jurisdiction over a foreign corporation is also established if a parent-subsidiary relationship is present between a New York corporation and a foreign corporation and there is either (1) a valid agency relationship between the two companies or (2) the parent's control over the subsidiary is so complete that the subsidiary can be considered a mere department of the parent." *Vendetti*, 802 F.Supp. at 890; *accord Grill v. Walt Disney Company*, 683 F.Supp. 66, 69 (S.D.N.Y.1988); *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65 (S.D.N.Y.1979). That a corporation is considered "local", without more, however, is not enough to establish personal jurisdiction over the foreign subsidiary. *Beech*, 751 F.2d at 120; *Grill*, 683 F.Supp. at 69 (local parent must be "acting as the agent of the subsidiary, or the parent's control over the subsidiary is such that the subsidiary is merely a department of the parent"). This is true even when the domestic parent is the sole shareholder of the foreign subsidiary. *Vendetti*, 802 F.Supp. at 892; *Saraceno*, 83 F.R.D. at 67.

■ Here, it is undisputed that MEC does not have any bank accounts, employees, ownership of leases on real property, public relations and publicity work or sales within the state. Accordingly, if jurisdiction is to lie under CPLR § 301, there must be a showing

12. I would note that *Omni* does *not* stand for the proposition that a court's inquiry is simply limited to whether a state's long arm statute makes a foreign country defendant amenable to service. Footnote 9 of the decision, although not often referred to in the published decisions since *Omni*, is an important component of the inquiry. *See e.g. Lorelei Corp v. County of Guadalupe*, 940 F.2d 717, 720 (1st Cir.1991). Typically, an entity's presence in a forum is not at issue and thus jurisdiction will hinge on the ability to meet a state's long-arm statute. Footnote 9 of *Omni* has significance here where jurisdiction is predicated on a mere department theory. At least in New York, as will soon be discussed, the mere department theory does not fall within the purview of the state's long arm statute.

13. Congress has amended Fed.Rule of Civ.P. 4(e) effective December 1993. The change is not outcome determinative as I will discuss later in the decision.

14. By contrast, Fed.R.Bankr.P. 7004(d) provides for nationwide service of process. That is why, in bankruptcy cases, where we are dealing only with citizens of different states, the traditional analysis becomes "academic." *Trap Rock*, 155 B.R. at 889 (citing *Outlet*, 82 B.R. at 698). This is so because, in this context, the minimum contacts need only be with the United States and, by definition, a domestic entity will satisfy this requirement.

by a preponderance of the evidence of a valid agency relationship or that Levant's control of MEC is so complete as to render MEC a mere department.

The seminal New York case dealing with the principles of personal jurisdiction and agency is *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (N.Y.), *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). In *Frummer*, the foreign hotel's New York agent, an affiliated company, performed various services for the hotel including solicitation of business, public relations and confirmation of reservations. The Court of Appeals determined that personal jurisdiction over the foreign party existed, holding that the significant and pivotal factor in its determination was that the domestic agent had performed all the business which the foreign parent could have were the foreign parent in New York by its own officials. The Second Circuit has since interpreted *Frummer* to stand for the proposition that a foreign corporation is deemed to be "doing business in New York" for purposes of CPLR § 301 when the foreign corporation's New York representative provides the foreign parent with sufficiently important services, beyond "mere solicitation." *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968). This has become known as the "solicitation plus additional activities" doctrine. *Aquascutum of London, Inc. v. S.S. American Champion*, 426 F.2d 205, 211 (2d Cir.1970); *Grill*, 683 F.Supp. at 69.

Although MEC unquestionably acted as Levant's agent in Greece, I would have to determine whether under *Frummer* Levant acted as MEC's agent in New York. *See Grill*, 683 F.Supp. at 69; *accord Advance Coating Technology, Inc. v. LEP Chemical, Ltd.*, 142 F.R.D. 91, 96 (S.D.N.Y.1992). This is simply not the case nor does Levant claim otherwise. Accordingly, no agency relationship exists between MEC and Levant through which personal jurisdiction could be established under CPLR § 301.

 Levant alternatively argues that jurisdiction can be established since the control it exerts over MEC is so complete as to render MEC a mere department of Levant. A corporation is deemed a mere department of another corporation if the latter's control is so pervasive that the corporate separateness is more a formality than a reality. *Palmieri v. Estefan*, 793 F.Supp. 1182, 1187 (S.D.N.Y.1992). Four factors guide the determination of whether personal jurisdiction exists under the "mere department" theory:

(1) common ownership;

(2) financial dependency of subsidiary on the parent;

(3) the degree to which the parent corporation interferes with the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and

(4) the degree of control over the marketing and operationship policies of the subsidiary exercised by the parent.

*Beech*, 751 F.2d at 117; *Vendetti*, 802 F.Supp. at 892. The case law has plainly recognized that the first of these factors, common ownership, is essential; the other three, while important, are not vital. *Beech*, 751 F.2d at 120, *citing Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895 (1972); *Estefan*, 793 F.Supp. at 1187–88; *Advance Coating*, 142 F.R.D. at 95. If common ownership is not established, the inquiry ends. *Knapp v. Consolidated Rail Corporation*, 1992 WL 170891, *3 (W.D.N.Y.1992); *Nippon EMO–Trans Co., Ltd. v. EMO–Trans. Inc.*, 744 F.Supp. 1215, 1230 (E.D.N.Y.1990); *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 565 (S.D.N.Y.1985).

It is to these four factors that I now turn. Typically, personal jurisdiction disputes of this sort arise when a third party is trying to assert jurisdiction over a foreign corporation through its local affiliate. Here, by contrast, the adversary proceeding is between the parent and the subsidiary themselves. Another distinguishing feature in this case is the fact that MEC is not the wholly owned subsidiary of Levant. In most of the reported cases in this area, common ownership was taken as a given since the foreign entity was a wholly owned subsidiary of the New York entity.

*See, e.g., Beech,* 751 F.2d at 120; *Derthick, et al. v. Bassett–Walker, Inc.,* 1992 WL 249951, *3 (S.D.N.Y.1992); *Advance Coating,* 142 F.R.D. at 95; *Morse Typewriter v. Samanda Office Communications,* 629 F.Supp. 1150, 1153 (S.D.N.Y.1986). Although there is not a *per se* rule barring suits against a foreign entity which is not a wholly owned subsidiary, nearly identical ownership interests must be found before one corporation can be considered a mere department of another. *Beech,* 751 F.2d at 120.

It is undisputed that Levant owns no direct interest in MEC. *See* Joint Pre–Trial Order ¶ 4. In *Estefan,* the common ownership test was satisfied notwithstanding the fact that the New York entity did not directly own each of the foreign affiliates. 793 F.Supp. at 1188. However, unlike in *Estefan,* where each of the foreign affiliates and the New York entity ultimately shared the same parent, here, the record establishes that MEC and Constellation are not ultimately owned by the same parent. The ownership interests in MEC are fractured among Constellation and several other local Greek investors. Although the record does not precisely quantify the holdings of each of the shareholders, it is clear that Methenitou owns six shares, or 6%, of MEC and that she owns no shares of Constellation or Levant. The record also establishes that Constellation owns 52% of MEC. Contrasting the names of the shareholders of Levant in the record with those of MEC and with those of Constellation, we divine that there is no overlap of investors. The common ownership is therefore limited to Levant's indirect ownership of 52% of MEC. This level of ownership interest is not sufficient to establish the nearly identical ownership interests required for personal jurisdiction under a mere department theory. This conclusion is bolstered by an absence of common directors. I cannot help but note that Levant's inability to retrieve the funds at issue from MEC in the normal course of business attests to MEC's independence and supports the conclusion that the management of the two companies are not "nearly identical" for purposes of the common ownership test.

That said, I need not discuss the other factors, although there too I am not convinced that Levant has made a sufficient showing to establish jurisdiction.[15] Accordingly, personal jurisdiction over MEC pursuant to CPLR section 301 is inappropriate.

*New York's Long–Arm Statute: CPLR § 302*

Levant also asserts personal jurisdiction over MEC pursuant to CPLR section 302, New York's long-arm statute. I note, at the outset, that although the August 22, 1993 affidavit of Demetrios Bekas as well as Levant's memorandum of law accuse MEC of stealing a corporate asset, the complaint is devoid of any allegations of tortious conduct which might give rise to jurisdiction under 302(a)(2) or (a)(3). Further, no testimony was adduced which would lead me to believe that jurisdiction could be established under either of these sections. Indeed, the evidence indicates that the Levant board authorized Skoufalos to sign the booking liner note with Methenitou. Thus, the predicate tortious act has not been established. Accordingly, jurisdiction can only exist, if it is to exist, under CPLR 302(a)(1).

▮▮▮ CPLR section 302(a)(1) provides for jurisdiction over any non-domiciliary who transacts any business within the state or contracts anywhere to supply goods or services in the state, so long as the cause of

---

15. As to the third factor, while it is unclear whether Skoufalos and Mamoulakis exercised more control over the selection of MEC's executives than would be appropriate for the principals of a parent organization, it is clear that the two companies observed many independent corporate formalities, including the liner booking note, other business contracts, and the Agency Agreement. These types of agreements would be all but unnecessary between a parent and a "mere department." Additionally, MEC's bank accounts and books were maintained separately from Levant's, and MEC held annual shareholder meetings. Nor am I convinced that Levant has met its burden as to the fourth factor. This factor looks at the intertwining of operations and marketing. MEC and Levant leased some contiguous office space and shared one phone line in Greece. Methenitou flew to New York in furtherance of MEC's duties in relation to Levant. While these activities show some inter-connection between the entities, they do not rise to the level of control over operations and marketing necessary to deem MEC a "mere department" of Levant.

action arises from that contract. *A.I. Trade,* 989 F.2d at 80; *Loberiza v. Calluna Maritime Corp.,* 781 F.Supp. 1028, 1031 (S.D.N.Y. 1992); *Trap Rock,* 155 B.R. at 887 (nexus between the activity and the claim must exist). The showing necessary for a finding that a defendant "transacted business" under section 302(a)(1) is considerably less onerous than the showing needed to establish that the entity was "doing business" within the meaning of section 301. *Hoffritz,* 763 F.2d at 58. In determining whether a non-resident company has transacted business in New York under section 301(a)(1), the court must look at the totality of the defendant's activities and then determine if the defendant has engaged in such purposeful availment so as to invoke the benefits and protection of New York's laws. *Loberiza,* 781 F.Supp. at 1032.

■ In this case, the parties never contracted, either in the agency agreement or in the disputed transaction, to provide goods or services in New York. The only activity which took place in New York was Alouf's placement of an overseas telephone call to Niego. Effective as those initial communications may have been, I can not impute to MEC Alouf's actions on behalf of Levant. The fact remains that the agreement with the third party shipper was not consummated in New York; nor was the disputed transaction between Levant and MEC. There simply is not enough to conclude that MEC transacted business in New York.

Despite Levant's arguments, I find *Paribas Corp. v. Shelton Ranch Corp.,* 742 F.Supp. 86 (S.D.N.Y.1990) distinguishable from this matter. In *Paribas,* a foreign party's trips to New York constituted "transacting business" because they were part of the negotiations which ultimately formed the basis for at least three agreements which selected New York as the forum for litigation. *Id.* at 90–91. Although Methenitou did visit New York in furtherance of MEC's business as Levant's agent, those visits had nothing to do with the current dispute, and did not lead, as in the *Paribas* case, to any agreements

between the parties. Accordingly, under this test, MEC is not subject to personal jurisdiction under section 302(a)(1).

*The Recent Amendments*

■ One final matter which I need touch upon is the December 1993 amendment of Fed.R.Civ.P. 4(e). One could argue that Rule 7004(e), which still governs service upon those found in foreign countries, combined with new Rule 4 renders the CPLR-based inquiry obsolete. This could be argued to be so because new Rule 4 appears considerably broader in scope than its predecessor and seems to now provide a mechanism for worldwide service of process which its predecessor did not. *See* Bankr R. 7004(e) and Fed R.Civ.P. 4(f).[16]

If the new procedure provides for worldwide service of process, I would not have to look to the CPLR to determine whether personal jurisdiction exists over MEC. *See Point Landing, Inc. v. Omni Capital Intern., Ltd.,* 795 F.2d 415, 419 (5th Cir.1986), *aff'd sub nom. Omni Capital,* 484 U.S. 97, 108 S.Ct. 404, *citing Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972) (amenability to personal jurisdiction by service under a long-arm statute need not be decided if a federal statute permits service of process "wherever the defendant may be found.") Similarly, the Due Process clause of the Fifth Amendment, rather than the Fourteenth Amendment would provide the constitutional limits on a court's exercise of personal jurisdiction over MEC. *United Electrical Radio and Machine Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1085 (1st Cir. 1992); *L'Europeenne De Banque v. La Republica De Venezuela,* 700 F.Supp. 114, 123 n. 10 (S.D.N.Y.1988). In such circumstances, the U.S. Constitution requires only that the defendant have the requisite "minimum contacts" with the United States, rather than with New York. *United Electrical,* 960 F.2d at 1085. Even applying the broader test, I do not find that MEC purposefully availed itself of the privilege of conducting activities

---

16. The bankruptcy rule which invokes the federal rule, that is, Bankruptcy Rule 7004(e), no longer squares with Rule 4. For the bankruptcy rule invokes Fed.R.Civ.P. 4(e) (which used to deal with service abroad), but Rule 4(e) has been renumbered 4(f). Thus it is questionable whether one can utilize the provisions of Rule 4(f).

**234**

within the United States. *Id. citing Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Additionally, I find the "panoply of other factors" which bear upon the fairness of requiring MEC to defend a suit in the United States militates against my asserting jurisdiction in this case. *United Electrical,* 960 F.2d at 1088. Since the amendments to the Federal Rules of Civil Procedure are not outcome determinative, I need not reach the question of whether it is "just and practicable" to apply them here (in light of the fact that they became effective during the pendency of this case). *See* Order of the Supreme Court of the United States Adopting and Amending Rules, April 22, 1993; *see also United Rope Distributors v. Seatriumph Marine Corp.,* 930 F.2d 532, 536 (7th Cir.1991).

*Conclusion*

In light of the activities of Skoufalos and Mamoulakis, it is with a certain reluctance that I conclude that I lack personal jurisdiction over MEC. That said, it is axiomatic that I must decline to grant the default judgment. I would note that although the Bank has failed to appear in this case, not a scintilla of evidence has been adduced to suggest that I have personal jurisdiction over it. Accordingly, I decline to grant the default judgment against the Bank at this time. Having thus determined MEC's motion, I need not reach the issue of forum non conveniens. Accordingly, this adversary proceeding is dismissed as to MEC and the motion for entry of a default judgment is denied.

The defendant is directed to SETTLE AN ORDER consistent with this decision.